23 N.J. Super. 496 (1952)
93 A.2d 216
LOUIS MAZZILLI, PLAINTIFF-APPELLANT,
v.
ADAM SELGER AND FRANCES SELGER, DEFENDANTS-RESPONDENTS, AND KENNETH SELGER, DEFENDANT-CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 17, 1952.
Decided December 9, 1952.
*498 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
Mr. Robert C. Gruhin argued the cause for plaintiff-appellant (Mr. Morris Edelstein, attorney).
Mr. Elmer J. Bennett argued the cause for defendant-respondent Adam Selger (Messrs. Carpenter, Gilmour & Dwyer, attorneys).
Mr. George J. Kaplan argued the cause for defendant-cross-appellant.
The opinion of the court was delivered by FRANCIS, J.C.C. (temporarily assigned).
On April 21, 1949 the cross-appellant Kenneth Selger, an infant nine years and ten months of age, fired a shotgun and wounded appellant Louis Mazzilli. Mazzilli then sued him for compensatory and punitive damages, and Adam Selger and Frances Selger, his father and mother, for compensatory damages. The trial court granted the motion of the father and mother for judgment in their favor. The case was submitted to the jury against Kenneth and verdicts of $20,000 for compensatory, and $5,000 for punitive, damages were returned against him.
Mazzilli appeals from the judgment in favor of the parents and Kenneth appeals from the denial of his motion to dismiss the punitive damage count against him.
The record discloses that a corporation of which respondent Adam Selger is president owns a three-acre tract of land on Cedar Avenue, Secaucus, New Jersey. Two small frame houses are situated thereon, separated by upwards of 200 feet. At and prior to the day in question Adam Selger occupied one of the two houses, it being 836 Cedar Avenue; his wife Frances Selger, occupied the other at 880 Cedar *499 Avenue. Adam lived alone; their son Kenneth, one Jack Phillips, a son of Mrs. Selger by a former marriage, and Mrs. Selger lived together in the other house.
It appears also that Mr. and Mrs. Selger had been separated for some years and that prior to January 6, 1948 she had brought a separate maintenance action against him. On January 6, 1948 an order had been entered therein in which she was awarded $35 weekly for her support and maintenance and for that of their infant son, Kenneth, "in her custody." This order was made retroactive to October 8, 1947. There is no dispute that the parties have remained separated, nor is it disputed that throughout the separation and down to the time of the trial of the present case Kenneth has resided with and been under his mother's control.
Jack Phillips, Mrs. Selger's son by her former marriage, and Kenneth occupied the same bedroom in her home. About two weeks before April 21, 1949 Phillips, who had a license to do so, went hunting with a shotgun. On returning home he cleaned the gun in his bedroom. Then he put it together again and "broke" it. Obviously this means moving the barrel away from the trigger mechanism so that the gun cannot be fired.
Apparently while the shotgun was being cleaned Kenneth was in the room with his half-brother, because Mrs. Selger said she called "her sons in to eat." On doing so Phillips left the broken gun standing in a corner of his room. Mrs. Selger went into the room and on seeing the gun put it on the top shelf of the closet, and according to her "there it stayed." When she put it there she told Phillips not to leave it standing in the corner.
On the day in question appellant was working for Adam Selger, repairing a fence on the property at a point near Mrs. Selger's house. Kenneth and a young companion, Steve Marchuck, were also around the house. According to Marchuck, Kenneth had been talking with Mazzilli about a pocket knife Mazzilli had promised him a few days before. He said Kenneth did not get the knife and "first they were arguing." *500 Then Kenneth said he "is getting the gun." The boys went into the house; Kenneth got on the bed in his and Phillips's bedroom, climbed up on the bed post, reached into the closet, and removed the shotgun from the shelf where Mrs. Selger had placed it.
Kenneth told Marchuck to get some shells. He looked but did not find them in the drawers. So Kenneth got a cartridge of buckshot from the top drawer of Phillips' dresser and loaded the gun with it.
Marchuck said Kenneth stood at the window and pointed the gun at Mazzilli who ran around the house. It is not clear from Mazzilli's testimony that this incident took place. In any event, his version of the actual shooting was that he observed Kenneth standing in the window with the gun at shoulder level pointing at him. Then the shot was fired and he fell to the ground, severely wounded.
According to Kenneth he was "kidding" when he got the gun and he neither pointed it nor discharged it at Mazzilli. He insisted that he permitted it to rest on the window sill as it was heavy for him to hold. While it was in this position, in some manner he bumped or pushed against the rear part of the gun and it was discharged. Then he noticed that the trigger guard was loose and it fell off.
A police officer who investigated the shooting asserted that the particular window sill had been freshly painted and he noticed paint marks on the shotgun. This officer testified also that the gun was heavy and that in his judgment a child of Kenneth's physique probably could not hold it at shoulder or chest level, aim and discharge it.
As we view the record the facts outlined were the controlling ones when the motions for dismissal as to the father and mother were made and granted.
Appellant argues that a jury question was presented as to both parents because under the circumstances shown their conduct in permitting their child to have access to a dangerous instrumentality which the child used to his injury, justified a finding of negligence.
*501 There are cases in a number of jurisdictions in which liability has been imposed upon a parent who has provided a gun and ammunition or made a loaded gun accessible to a child of immature years and the child has used the weapon to a third person's injury. Mendola v. Sambol, 166 Pa. Super. 351, 71 A.2d 827 (Super. Ct. 1950); Giguere v. Rosselot, 110 Vt. 173, 3 A.2d 538 (Sup. Ct. 1939); Dickens v. Barnham, 69 Colo. 349, 194 P. 356 (Sup. Ct. 1921); Salisbury v. Crudale, 41 R.I. 33, 102 A. 731 (Sup. Ct. 1918); Souza v. Irome, 219 Mass. 273, 106 N.E. 998 (Sup. Ct. 1914); Annotations, 12 A.L.R. 812, 44 A.L.R. 1509.
The principle on which liability is supported appears in the New Jersey case of Vallency v. Riggillo, 91 N.J.L. 307 (E. & A. 1917). There a father left some dynamite cartridges about the house where his child of tender years might reasonably be expected to find them. The child did find them and he and some other children began to play with them. While doing so defendant's child pounded one cartridge with a rock, causing an explosion and injury to one of his playmates. In this situation the Court of Errors and Appeals said that it was for the jury to say: (1) whether it was negligent under the circumstances for the defendant to leave the cartridges where he did; (2) if so, did the child do what a prudent man, knowing what the defendant knew, would reasonably expect it might do as the result of such negligence, and (3) was the child of such tender years or imperfect understanding that it did not have the capacity to estimate or appreciate the dangerous nature of its act. And the court declared that if these three questions were answered in the affirmative ground for recovery existed; but if any one of them were found in the negative there could be no recovery.
In applying this doctrine to the present case, the circumstances make it necessary to consider the responsibility of the father and mother separately.
*502 So far as Adam Selger is concerned, did he have control over his infant son or the gun? Did he even know that the gun was on the shelf in his son's bedroom closet? Is there any evidence demonstrating knowledge on his part that his stepson, Phillips, had cartridges in his unlocked dresser drawer, or that they were accessible to Kenneth? Plainly all of these questions must be answered in the negative.
As indicated, the proof shows the long-time separation of the parents, their occupation of separate homes, and the custody of the boy in his mother with whom he resided and under whose dominion he was. It is not even suggested that the father had any right to go into his wife's home and search for or appropriate a gun or cartridges even if he knew they were somewhere there. And there is even less basis for the assertion of any right or duty on his part to remove from his wife's home cartridges belonging to his stepson, over whom it does not appear either that he had the slightest control or that he had in any wise assumed an in loco parentis position.
Under the circumstances the elements necessary to the existence of fault, which were brought into our case law by Vallency v. Riggillo, supra, were not established and no error was committed by the trial court in entering judgment for the father.
As to the mother, a somewhat different situation was disclosed. She knew of the presence of the shotgun in her home and in an apparent effort to remove it as a source of temptation to a young and immature boy, she put it on the shelf in the closet of her boys' common bedroom and out of the normal reach of her younger son. If the gun was loaded to her knowledge when she placed it on the shelf, or if she knew that there were shells in her older son's dresser drawer which were accessible to Kenneth, then whether or not her conduct constituted reasonable prudence, in the light of the boy's ability to get at the gun with a little ingenious climbing, would be for the jury to determine. But the situation *503 was otherwise in a respect which makes the difference between the existence of a mere inactive condition, of itself incapable of any active potentiality for harm, and the producing cause of the wounding of the appellant. The shotgun was broken and unloaded when she deposited it on the shelf. In that condition it was not dangerous. If Kenneth had retrieved it from the closet in that condition, no harm could have followed. A cartridge was necessary to turn an innocuous instrument into a lethal weapon. And there is not a shred of evidence in the record that Mrs. Selger knew or should have known that her older son had left cartridges about the room or anywhere in the house where they would be available to Kenneth. Therefore it is apparent that there was an independent, efficient cause which intervened between the mother's course of conduct and the metamorphosis of a mere harmless contrivance into a dangerous instrumentality. That cause was the act of the older brother in leaving the cartridges in the bedroom where they were readily available to Kenneth and where, in fact, he seemed to know they were.
Thus, appellant having failed to establish facts from which a jury would be justified reasonably in concluding that Mrs. Selger's acts or failure to act were the proximate cause of the discharge of the gun and the injury, the trial court was obliged to grant her motion for judgment. Smith v. Public Service Corp., 78 N.J.L. 478 (E. & A. 1910); Powers v. Standard Oil Co., 98 N.J.L. 730 (Sup. Ct. 1923); Breker v. Lakewood Water Co., 12 N.J. Misc. 721 (Sup. Ct. 1934); Saracco v. Lyttle, 11 N.J. Super. 254 (App. Div. 1951).
One further phase of the case remains to be considered, namely, the punitive damage award against the infant.
It is argued in his behalf that the uncontradicted evidence shows that the discharge of the gun was accidental. However, the argument overlooks pertinent facts given by Mazzilli. He said Kenneth was standing in the window with the gun shoulder high pointing at him just as it went off. This is in conflict with the assertion that it was resting *504 on the window sill and accidentally bumped into. As a result what actually took place was for jury determination.
There was evidence from which it could be inferred that Kenneth was aware of the capacity for harm inherent in a loaded gun. In order to establish a wanton injury, with which he was charged, and thus justify a punitive damage award against him, it was necessary to show that with "knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences," he "consciously and intentionally" fired the shotgun. King v. Patrylow, 15 N.J. Super. 429, 433 (App. Div. 1951); Staub v. Public Service Ry. Co., 97 N.J.L. 297, 300 (E. & A. 1922).
In our judgment the facts of the shooting were such that the question of wantonness was properly submitted to the jury for determination.
The judgments on both appeals are affirmed.