Kuhns *v.* Brugger, Appellant.

332

Argued March 18, 1957. Before Jones, C. J., Bell, Chidsey, Musmanno, Arnold, Jones and Cohen, JJ.

reargument refused November 12, 1957.

William F. Illig, with him A. Grant Walker and Gifford, Graham, MacDonald & Illig, for appellant.

John G. Gent, with him Curtze & Gent, for appellant.

Charles E. Kenworthey, with him Frank B. Quinn, James H. Hardie, Quinn, Leemhuis, Plate & Dwyer, and Reed, Smith, Shaw & McClay, for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, October 7, 1957:

On July 23, 1953 a tragic and unfortunate event occurred which has resulted in this litigation. Albert G. Kuhns, 12 years old, was wounded by a bullet from a pistol discharged by his cousin, George A. Brugger, also 12 years old, while in the cottage of their common grandfather, George W. Bach, located at Manchester Beach, Erie County, and, as a result thereof, Kuhns sustained serious physical injuries.

Through a guardian, Kuhns instituted a trespass action, joined in by his parents, against George Brugger; later, by permission of court, the executor of the George W. Bach Estate was joined as an additional party defendant.[1] A motion for severance of the actions having been refused, the suit against both de-

---

[1] George W. Bach, the grandfather, died subsequent to the shooting incident but prior to the time suit was instituted.

fendants proceeded to trial. The jury returned a verdict against both defendants in the amount of $182,-096; the Court below later reduced this amount to $116,604.60 and this reduction was accepted by plaintiffs. From a judgment entered on the verdict these appeals were perfected.

Both defendants have appealed, requesting judgments n.o.v., or, in the alternative, new trials. In considering these appeals the scope of appellate scrutiny of the evidence varies. Upon an appeal from the refusal to grant a motion for judgment n.o.v. the testimony must be read in the light most favorable to the verdict winner, all conflicts therein must be resolved in his favor, and he must be given the benefit of all facts and inferences from facts reasonably deducible from the evidence: *Wolansky v. Lawson,* 389 Pa. 477, 481, 133 A. 2d 843; *Wilbert v. Pittsburgh Consolidated Coal Co.,* 385 Pa. 149, 154, 122 A. 2d 406; *Lessy v. Great Atlantic & Pacific Tea Company,* 121 Pa. Superior Ct. 440, 444, 183 A. 657. However, this rule does not apply upon appeal from the refusal of a new trial.[2] In determining the propriety of the refusal of a new trial the present Chief Justice Jones stated in *Wilbert v. Pittsburgh Consolidated Coal Co.,* supra (pp. 156, 157): "Practically all of the evidence was introduced by way of oral testimony the credibility whereof was necessarily for the jury whose verdict will

---

[2] See footnote in *Sherman v. Manufacturers Light and Heat Company,* 389 Pa. 61, 68, 132 A. 2d 255, wherein Mr. Justice Bell said: "It is sometimes erroneously contended that in considering the grant or refusal of a new trial, just as in a consideration of an appeal from the refusal to take off a nonsuit or from the entry of a judgment non obstante veredicto, all of the evidence must be taken in the light most favorable to the verdict winner. Of course this is not the correct test on an appeal from the grant or refusal of a new trial: [Citing cases]"

not be set aside as being against the evidence unless it appears to be arbitrary and capricious. A determination in such regard is, in the first instance, within the province of the trial court whose decision will not be disturbed unless there is clear error of law or palpable abuse of discretion." In determining the validity, of a refusal to enter judgment n.o.v. we examine the evidence to determine whether or not sufficient proof was adduced at the trial to justify the submission to the jury of each factual question: *Ashcraft v. C. G. Hussey and Co.*, 359 Pa. 129, 134, 58 A. 2d 170. With these principles in mind the following factual narrative emerges.

Bach, an elderly man, owned and occupied—at least, part of each year—a one story cottage at Manchester Beach on the shore of Lake Erie. This cottage was located in a somewhat isolated area in the immediate vicinity of which were several commercial fisheries. A hunting devotee, Bach owned various guns and other firearms including the Colt Woodsman .22 calibre automatic pistol which constitutes the focal point of this incident. When this pistol was not in use Bach kept it in a *loaded* condition in an unlocked dresser drawer in his unlocked bedroom.

At approximately noon on July 23, 1953, Bach's two young grandsons, Kuhns and Brugger, went fishing; upon their return at approximately 3:30 P.M. and during Bach's absence, the boys entered their grandfather's bedroom. Katrina Brugger—Brugger's 2 year old sister—was then playing in the bedroom. In a spirit of play Brugger picked up a so-called "under and over" gun—a combination shotgun and rifle—and pointed it at Kuhns. As he did this, Miss Fries, a great aunt of the boys, entered the bedroom and ordered Brugger to put away the gun which he did. A few minutes later Brugger went to his grandfather's

dresser and found in the top left drawer thereof the Colt automatic pistol,[3] previously mentioned, which was then loaded with a clip of cartridges resting in its handle. In order to prepare this pistol for firing one draws back an upper slide forcing a cartridge into the firing chamber and the cartridge is then exploded by pulling the trigger. There was some testimony that this pistol at the time was mechanically defective and that, on occasion, if one held his finger on the trigger as he pulled back the slide, the pistol would discharge, without the added requirement of squeezing the trigger—a one-step, rather than a two-step procedure.

According to Brugger[4] the shooting occurred in the following manner: "And I took it [the pistol] out, took it out of the holster, took it in my hand. I believe I had my finger on the trigger. And I pulled the slide back, and then the shot occurred." The bullet, thus ejected, penetrated Kuhns' body and perforated the spinal cord, paralyzing the entire lower portion of his body and destroying all voluntary control of his organs in that part of his body. His condition, as portrayed at trial, is such that he can no longer walk, requires constant care and medication and can never be gainfully employed.

The defendant Brugger takes the dual position that the evidence was insufficient as a matter of law to establish any negligence on his part and that the Court below, in submitting the question of his negligence to

---

[3] The words "pistol" and "revolver" are used, in common parlance, indiscriminately; strictly, however, a "revolver" must have a revolving cylinder and chambers for cartridges: *Bright v. State*, 125 Neb. 817, 252 NW 386.

[4] This testimony was inadmissible against the Bach Estate because of the prohibition of the so-called "Dead Man's Rule" (Act of May 23, 1887, P. L. 158, §5(e), 28 PS §322).

the jury, not only held him, a minor, to the standard of conduct required of an adult, but, in effect, charged the jury that he was guilty of negligence per se in that he had violated a criminal statute. We shall first concern ourselves with Brugger's appeals.

Brugger's contention that he is entitled to judgment n.o.v. because of the lack of sufficient evidence of negligence on his part is clearly untenable. This Court, in *Fredericks v. Atlantic Refining Co.*, 282 Pa. 8, 13, 127 A. 615, set forth the required rule of conduct when dealing with *any* dangerous agency: "A higher degree of care is required in dealing with a dangerous agency than in the ordinary affairs of life or business, . . . every reasonable precaution suggested by experience and the known danger ought to be taken . . ." See also *Maternia v. Pa. R. R. Co.*, 358 Pa. 149, 56 A. 2d 233; *Summit Hotel Company v. National Broadcasting Company*, 336 Pa. 182, 8 A. 2d 302; *Konchar et al. v. Cebular*, 333 Pa. 499, 3 A. 2d 913. Any loaded firearm, including a pistol, is a highly dangerous instrumentality and, since its possession or use is attended by extraordinary danger, any person having it in possession or using it is bound to exercise extraordinary care. A person handling or carrying a loaded firearm in the immediate vicinity of others is liable for its discharge, even though the discharge is accidental and unintentional, provided it is not unavoidable: *Lindh v. Protective Motor Service Co., Inc.*, 310 Pa. 1, 4, 164 A. 605; *Winans v. Randolph*, 169 Pa. 606, 32 A. 622; *Knasiak v. Rambo*, 57 Pa. Superior Ct. 8; *Gaussman v. Philadelphia & Reading Railway Co.*, 55 Pa. Superior Ct. 542.[5] When a person picks up a fire-

---

[5] Our legislature has recognized that a young child and a firearm constitute a dangerous combination. The Penal Code (Act of June 24, 1939, P. L. 872, §626, 18 PS §4626) declares that any person who knowingly and wilfully sells or causes to be sold a

arm, points it at another[6] and operates the firing mechanism, with or without the knowledge that the firearm is loaded, and the firearm is discharged, and the evidence so indicates, then a prima facie case of negligence is established.

Brugger submits, however, that, because of his age, he was presumptively incapable of negligent conduct and therefore his conduct did not render him liable for the injury which followed the discharge of the firearm. In short, Brugger relies upon his age to absolve him of *any* culpability for his actions and the manner in which the Court below instructed the jury to secure a new trial.

Even though the standard of care applicable to a minor differs from that applicable to an adult,[7] never-

---

deadly weapon to a person under 18 years of age is guilty of a misdemeanor. It is also unlawful for a person between 12 and 14 years of age to use firearms for hunting unless accompanied by a parent, guardian or adult member of his family: Act of June 3, 1937, P. L. 1225, Art. III, §316, as amended, 34 PS §1311.316(d).

The Uniform Firearms Act (Act of 1939, supra, §628, as amended, 18 PS §4628) prohibits the delivery of a firearm—a pistol or revolver with less than a 12″ barrel, a shotgun with less than a 24″ barrel or a rifle with less than a 15″ barrel—to any person under the age of 16 years. See: *Mautino et al. v. Piercedale Supply Company*, 338 Pa. 435, 13 A. 2d 51; *McMillen et al. v. Steele*, 275 Pa. 584, 119 A. 721; *Shaffer et ux. v. Mowcry*, 265 Pa. 300, 108 A. 654; *Wassel et ux. v. Ludwig*, 92 Pa. Superior Ct. 341; *Pierson et al. v. London*, 102 Pa. Superior Ct. 176, 156 A. 719.

[6] Kuhns said that Bruggers "pointed" the gun at him. Brugger on direct examination stated: "When I took it [the pistol] out of the drawer, I was facing that way [Albert's direction]. And when I pulled the slide back, I mean that was the way I was facing, and that was the way it was pointed." On cross-examination he stated: "Q. The gun was pointed toward Albert? A. Yes sir. Q. Who pointed it? A. I did."

[7] The Restatement of the Law of Torts, §283, provides: "Unless the actor is a child, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable man under like

theless a minor may be guilty of actionable negligence. Both an adult and a minor are under an obligation to exercise reasonable care; however, the "reasonable care" required of a minor is measured by a different yardstick—it is that measure of care which other minors of like age, experience, capacity and development would ordinarily exercise under similar circumstances. In applying that yardstick, we place minors in three categories based on their ages:[8] minors under the age of seven years are conclusively presumed incapable of negligence;[9] minors over the age of fourteen years are presumptively capable of negligence, the burden being placed on such minors to prove their incapacity;[10] minors between the ages of seven and fourteen years are presumed incapable of negligence, but such presumption is rebuttable and grows weaker with each year until the fourteenth year is reached.[11]   As the late **Mr.**

circumstances." Comment (e) thereunder states: "A child of tender years is not required to conform to the standard of behavior which it is reasonable to expect of an adult, but his conduct is to be judged by the standard of behavior to be expected from a child of like age, intelligence and experience. The standard of conduct required of such a child is that which it is reasonable to expect of children of like age, intelligence and experience. In so far as concerns the child's capacity to realize the existence of a risk, the individual qualities of the child are taken into account."

[8] By analogy to the criminal law: *Com. v. Zietz*, 364 Pa. 294, 72 A. 2d 282; *Com. v. Bowes*, 166 Pa. Superior Ct. 625, 74 A. 2d 795.

[9] *Quattrochi v. Pittsburgh Rys. Co.*, 309 Pa. 377, 164 A. 59; *Counizzarri v. Phila. & R. Ry. Co.*, 248 Pa. 474, 94 A. 134; *Reichle v. Phila. Rapid T. Co.*, 241 Pa. 1, 88 A. 79.

[10] *Kohler v. Schwenk*, 144 Pa. 348, 22 A. 910.

[11] *Rasmus v. Pennsylvania R. R. Co. et al.*, 164 Pa. Superior Ct. 635, 67 A. 2d 660; *Braden et al. v. Pittsburgh*, 143 Pa. Superior Ct. 427, 18 A. 2d 818. See also: *Pierontoni v. Barber*, 384 Pa. 56, 119 A. 2d 503; *Koenig v. Flaherty*, 383 Pa. 187, 117 A. 2d 719; *Jennings v. Glen Alden Coal Co.*, 369 Pa. 532, 87 A. 2d 206; *Krenitsky v. Kelly*, 309 Pa. 234, 163 A. 450; *Edelman et al. v. Connell*,

Justice ALLEN STEARNE said in *Koenig v. Flaherty,*
383 Pa., supra (page 190) : "The standard by which
actions of children are to be measured is the child's
capacity to appreciate the danger involved: Philadel-
phia, Baltimore and Wilmington R. R. Co. v. Layer,
112 Pa. 414, 419, 3 A. 874. This capacity is usually
determined by the understanding expected from chil-
dren of like age, intelligence and experience: [Citing
cases]."

Brugger at the age of 12 years was not to be judged
by adult standards; on the contrary, it was necessary
to inquire whether his conduct was such as should rea-
sonably have been expected of a child of like age, in-
telligence and experience. Brugger's culpability or
exculpability of actionable negligence depended upon
a measurement of his conduct based on variable fac-
tors—his capacity and understanding based upon his
age, intelligence, experience, etc.: a measurement
properly to be made by a jury with the opportunity
to evaluate his individual capacity to perceive danger.
Concerning the capability of negligent conduct of a
child between the ages of seven and fourteen it has
been said: "Generally their conduct has been deter-
mined by a jury. This has been because the ascertain-
ment of the capacity to perceive danger involves the
determination of judgment factors, i.e., knowledge, in-
telligence, experience, character of the danger, which
are often associated with questions of fact and hardly
ever beyond reasonable doubt . . .": 51 Dickinson L.
Rev. 79, 84, 85. Whether Brugger at his age and un-

257 Pa. 317, 101 A. 653; *Di Meglio v. Phila. & R. Ry. Co.,* 252 Pa.
391, 97 A. 476; *Lodge v. Pittsburgh & Lake Erie Railroad Co.,* 243
Pa. 10, 89 A. 790; *Parker v. Washington Electric Street Railway
Company,* 207 Pa. 438, 56 A. 1001; *Nagle v. Allegheny Valley Rail-
road Co.,* 88 Pa. 35; *Phillips v. Traction Co.,* 8 Pa. Superior Ct.
210.

der the circumstances had the capacity to understand, comprehend and perceive the danger and risk inherent in handling this pistol was most suitably a question for determination by a jury.

We have carefully examined the trial judge's instructions to the jury on the law applicable to the determination of Brugger's negligence and find such instructions free from error. The trial judge was singularly cautious in explaining to the jury the requisite standard of conduct of a 12 year old boy, the presumption in his favor and the yardstick to be applied in measuring his conduct. Appellant's complaint concerning that portion of the instructions which referred to the possibility that Brugger might have violated a criminal statute in pointing the pistol at Kuhns is without merit. Whoever wantonly or playfully points a pistol at another offends against our criminal code (Act of June 24, 1939, P. L. 872, §716, 18 PS §4716) and the violation of a statute may be regarded as negligence per se (*Jinks et al. v. Currie et al.*, 324 Pa. 532, 188 A. 356) even though the violator be a minor (*D'Ambrosio et al. v. Phila.*, 354 Pa. 403, 47 A. 2d 256). The trial judge, referring to the statute, said: "Now, I can't instruct you, as a matter of law, that that [the statute] applies in this case and therefore makes George Brugger negligent per se, or because of that statute, because the question as to pointing is in dispute. George Brugger says he doesn't think he pointed it. The plaintiff said he did point it. Actually, the gun was pointed but it is a question of intention. *If George Brugger was mature enough to know better, and therefore negligent, then you may use that statute as evidence of negligence per se, and hold him for it. If he did not point it intentionally, then your determination of his guilt will be based upon carelessness, as we have described it for you, if it existed. . . ."*

(Emphasis supplied). At the close of the charge the trial judge reiterated the standard of conduct required of a minor. We fail to find any error of commission or omission at the trial which in any manner prejudiced or harmed the defendant Brugger. The verdict of the jury against Brugger was fully warranted by the evidence and a new trial was properly refused.

In considering the defendant Bach Estate's motion for judgment n.o.v. we must entirely eliminate certain portions of the testimony. Under the Act of 1887, supra—applicable to trespass actions, including actions to recover damages for personal injuries—a surviving or remaining party or any other person whose interest is adverse to one who is dead cannot testify as to matters which took place before the death if the deceased had some rights in the subject matter which have passed to a party on the record who represents his interest. Under this statutory provision the testimony of both Kuhns and Brugger must be eliminated from our consideration as it was in the Court below.

Eliminating such testimony the record reveals that the pistol was owned by Bach, that it was kept in an unlocked dresser drawer in his unlocked bedroom with a clip of cartridges in its handle, that young Brugger not only was aware of the existence of the pistol—having been shown it on several occasions by Bach—but also its place of containment in the bedroom, that the unlocked bedroom was open to members of the family, including young grandchildren, that Brugger and Kuhns were accustomed to enter the bedroom, that Kuhns was injured in the bedroom by a shot from a firearm and the pistol was on the top of the dresser immediately after the shooting, that Mrs. Bach related a conversation with Kuhns after the shooting in which he expressed no hard feelings toward Brugger in connection with his injury—this evidence, with

other testimony, was sufficient to establish prima facie negligence upon Bach's part.

The possession of this loaded Colt pistol did not constitute Bach an insurer against liability for injuries arising from its use nor render him liable without fault; it did, however, impose upon him a very serious and grave responsibility. Its possession placed upon him the duty of exercising not simply ordinary, but extraordinary care so that no harm might be visited upon others. We are not called upon to determine whether the possession of other instrumentalities or objects, such as knives, medicines, poisonous substances, etc., would impose the same degree of care under similar circumstances; we are simply to determine the degree of care imposed upon the possessor of a loaded pistol, a weapon possessing lethal qualities, under the circumstances. In this connection the language of Mr. Justice GIBSON in *Sullivan v. Creed*, 2 (Ir.) K.B.D. 317, 2 BRC 139, is appropriate: "A hatchet, a bottle of poison labeled 'poison', the same bottle unlabeled, a loaded gun, gunpowder, or dynamite, all represent articles of varying degrees of danger, and the greater the danger the higher is the standard of the diligence which the law exacts."

The duty imposed upon Bach encompassed all those persons who might suffer harm or injury from the pistol's discharge and included the pistol's use not only by Bach but its use by a third person if Bach knew or had reason to know that such person was likely to use the pistol in such a manner as to create "an unreasonable risk of harm to others."[12]

Over many years Bach's grandchildren were visitors and guests at the cottage. Not only were the general living quarters of the cottage unrestricted to them but

---

[12] Restatement of the Law of Torts, §308.

so also was his bedroom; in this respect the presence of little Katrina Brugger in the bedroom immediately before the shooting incident is highly significant. The grandchildren had the "run of the house" and Bach's bedroom was not "out of bounds".

In that bedroom were kept not only fishing equipment but, at least, two firearms—all attractive to interested boys. Not only was Brugger aware of the fact that his grandfather possessed this pistol but he knew that it was kept in the bedroom; of these facts the grandfather was cognizant. Despite knowledge that the grandchildren frequented the unlocked bedroom Bach not only kept the pistol in an unlocked drawer but also in a loaded condition, i.e. the clip of cartridges was in the pistol handle.

It is contrary to every human experience to expect that children, particularly boys, would not want to touch and handle a pistol. There is something magnetic about highly engined firearms with their harmonious lines and graceful proportions which attracts both young and old, whether the ordnance be a beautiful revolver, an old-fashioned fowling piece or a piece of artillery. Bach knew or should have known that any 12 year old boy, such as either of his two grandsons, might rummage around his bedroom and, finding the pistol, handle it. Applying either the "foresight" or the "hindsight" test, it is evident that Bach could have anticipated and foreseen the likelihood of harm resulting from leaving the loaded pistol in an unlocked drawer in a bedroom frequented by children.[13]

When Brugger came upon this pistol his first impulse—common to all boys—was to see if he could operate it. He, of course, entertained no desire to bring

[13] *Scurfield v. Federal Laboratories, Inc.*, 335 Pa. 145, 6 A. 2d 559, and cases therein cited.

harm to his playmate cousin, but was simply overwhelmed by an impulse the existence of which is known to adults and against which Bach should have taken precautions.

Under the circumstances Bach was under a duty to keep this pistol away from his young grandchildren. Counsel for the Bach Estate argue that the decedent had a perfect right to keep this pistol in his home if only to protect himself against nocturnal prowlers. It is argued: "Where else should George Bach, in the exercise of reasonable prudence, have kept a gun for protection against unexpected midnight intrusion except in the dresser drawer of his private bedroom, where it would be readily available in case of need?" No one can question the right or the prudence of Bach being armed against possible midnight prowlers and intruders. However, this shooting did not take place at nighttime, but in the afternoon in a room where the presence of young grandchildren might be anticipated. As common prudence, in behalf of self-protection, justified the possession of the pistol for immediate use at night, equal prudence, in behalf of protecting children, dictated that the pistol be kept under lock and key in the daytime, especially in the grandfather's absence.

We are not confronted with the question of a grandparent's liability for the tortious conduct of a minor grandchild; on the contrary, we are determining whether the grandparent by his own conduct was guilty of negligence, and whether, if negligent, his negligence was the proximate cause of Kuhns' injury. Bach's liability depends on the nature of the instrumentality involved, the place, the time and the persons likely to be brought in contact with the instrumentality. The gist of the liability sought to be imposed is that Bach was negligent in permitting a highly dangerous instrumentality to be in a place

where the incautious hands of a child might come in contact with it and the handling and discharge of this instrumentality by the child was the natural and probable consequence of Bach's negligence and such a consequence as might and ought to have been foreseen by Bach as likely to flow from his act.[14]   Bach's act in permitting this weapon, with its deadly potentialities, to remain in a place frequented by young children constituted negligence on his part; the intervention of his young grandchild did not break the chain of causation between his negligence and the injury which occurred and was a natural and probable result to be anticipated from the original negligence.

The Restatement of the Law of Torts, supra, §308, declares: "It is negligent to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to

---

[14] In *Condel et al. v. Savo et ux.*, 350 Pa. 350, 352, 39 A. 2d 51, it was stated: "At common law the mere relation of parent and child imposes upon the parent no liability for the torts of the child, but the parents may be liable where the act of the child is done as the agent of the parents or where the negligence of the parents makes the injury possible. The injury committed by the child must have been the natural and probable consequence of the parents' negligent act, that is, a consequence which, under the surrounding circumstances, might and ought reasonably to have been foreseen as likely to flow from such negligent act. . . . 'In determining what is the proximate cause, the true rule is, that the injury must be the natural and probable consequence of the negligence—such a consequence as, under the surrounding circumstances of the case, might and ought to have been foreseen by the wrongdoer as likely to flow from his act': Hoag & Alger, v. L. S. and M. S. Railroad Company, 85 Pa. 293; S. S. Pass Ry. Co. v. Trich, 117 Pa. 390, 11 A. 627; Milwaukee, etc. Railway Co. v. Kellogg, 94 U. S. 469; Swanson v. Crandall, supra."

others." Particularly significant is Comment b thereunder: "The rule stated in this Section has its most frequent application where the third person is a member of a class which is notoriously likely to misuse the thing which the actor permits him to use. *Thus, it is negligent to place loaded firearms or poisons within reach of young children or feeble-minded adults."* (Emphasis supplied). Appellant (Bach Estate) seeks to distinguish the Restatement rule on the ground that Bach did not "permit" the boy Brugger to use the pistol in that he did not expressly allow him to do so; such a distinction is unrealistic and would render meaningless Comment b. The further argument that, because of the juxtaposition of the words "young children" and "feeble-minded adults", Comment b is restricted to young children legally incapable of negligence does violence to the language of the Comment. Both the Restatement rule and the comment are apposite to the present situation.

The affixation of liability under circumstances similar to the instant situation is neither novel nor without precedent in other jurisdictions.[15]

---

[15] *Dickens et al. v. Barnham,* 69 Colo. 349, 194 P. 356 (a father permitted his 14 year old son to purchase a rifle but took no steps to make it inaccessible to his younger children; an 8 year old son took the rifle and, while playing with it, discharged it wounding another person; held to be a question of liability for the jury to determine whether the act of the father in permitting the child to have access to the dangerous instrumentality was the proximate cause of the injury) ; *Salisbury v. Crudale,* 41 R. I. 33, 102 A. 731 (father left a loaded gun under a bed where it was found by his 13 year old son who discharged it injuring the plaintiff; held that father's liability was for jury) ; *Souza v. Irome,* 219 Mass. 273, 106 N.E. 998 (held that jury could properly find that father was negligent in allowing his son to have a gun and ammunition) ; *Phillips v. Barnett,* 2 N. Y. City Ct. R. 20 (where a father kept a loaded revolver in an unlocked bureau drawer from which his 12 year old

A most interesting case is *Sullivan v. Creed,* supra. The facts were as follows: Sullivan and Creed, the lat-

son obtained it and shot another person, the court charged the jury that if they found that the father, under the circumstances, was negligent in placing a loaded revolver in an unlocked bureau drawer, within the reach of children too immature to appreciate its danger, and such negligence resulted in injury to the plaintiff, the father could be held liable for the consequences); *Smith v. Salvaggio,* 4 Tenn. C.C.A. 727 (the mother of an 8 year old boy was held liable for an injury inflicted when the boy injured the plaintiff through the discharge of a .22 rifle which the boy bought but which the mother knew that he had and used); *Marshall v. Wymond et al.,* 69 Ind. App. 162, 121 N.E. 449 (father of a 13 year old boy held liable for shooting by the boy of a mare on the theory that the father permitted the boy to use the rifle when he was not capable of so doing); *Bebee v. Sales,* 32 Times L. R. (Eng.) 413 (father of a 15 year old boy was held liable for injuries inflicted by the discharge of an air gun which the father had given the boy); *Sojka v. Dlugosz,* 293 Mass. 419, 200 N.E. 554 (father purchased a rifle and cartridges which he showed to his 13 year old son but gave no warning of its use nor forbade its use by the son; he left the rifle in the pantry and the cartridges in sweater pocket in the living room; the boy used the gun and injured another boy; father held liable); *Kuchlik et al. v. Feuer et al.,* 267 NYS 256, 239 App. Div. 338 (father held liable for action of son in shooting BB rifle which injured plaintiff on theory that father knew the boy possessed such a rifle); *Gudziewski v. Stemplesky et al.,* 263 Mass. 103, 160 N.E. 334 (whether father knew that 13 year old son had in his possession and used an air gun with which he shot another boy was question for jury). See also: *Phillips v. D'Amico,* (La.) 21 So. 2d 748; *Giguere v. Rosselot et al.,* 110 Vt. 173, 3 A. 2d 538; *Vallency v. Rigillo,* 91 N. J. 307, 102 A. 348; *Mazzilli v. Selger et al.,* 13 N. J. 296, 99 A. 2d 417, aff'g in part, and rev'g in part, 23 N. J. Super. 496, 93 A. 2d 216. Contra: *Lopez v. Chewiwie et al.,* 51 N. M. 421, 186 P. 2d 512; *Figone et ux. v. Guisti,* 43 Cal. App. 606, 185 P. 694; *Martin et al. v. Barrett et al.,* 120 Cal. App. 2d 625, 261 P. 2d 551; *Hagerty v. Powers,* 66 Cal. 368, 5 P. 622; *Skelton et al. v. Gambrell et al.,* 80 Ga. App. 880, 57 S.E. 2d 694. In Warren "Negligence in the New York Courts", Vol. 2, §86, p. 439, it is stated: "In some cases the negligence of the parent consists in permitting a child to use a dangerous instrumentality

.ter a 16 year old boy, were returning from mass along a public road; Creed left Sullivan at a gap leading to Creed's home; Creed's father that morning had been shooting rabbits and had left his loaded gun along the path leading from the public road to his home while he went to his home to read the papers; young Creed, enroute home, found the gun, called to Sullivan and, while pointing the gun in the direction of Sullivan, the gun went off and injured Sullivan. The language of Palles, C. B., is particularly apposite: "Lastly, I cannot think that it was beyond the province of a jury to hold that he [the father] might have foreseen that the taking of the gun by the boy would not have been an improbable result of his seeing it, in a place where there was not a parent or a person in authority to prevent him. I am, therefore, of opinion that a jury might well have found that the defendant ought, under the circumstances, to have foreseen that the boy might take possession of the gun. But even this is not necessary, for, in my opinion, the liability of the defendant would be the same if he ought to have foreseen that *any* boy, as distinguished from this particular boy, might have seen and handled the gun; and having regard to the place in which it was placed, I think it would have been wholly impossible to have withdrawn from the jury the question whether he ought to have so foreseen. This alone, however, would not be enough. Ought he then

---

such as an air rifle or gun. In these cases the negligence of the parent does not arise out of the discharge of the gun by the child but the permitting the child to have it so that through its wrongful discharge injury may result to others. In order for the parent to be held liable even under these circumstances, however, his act must be established by proof as previously indicated. Where the act charged is the wrongful use of a gun, it must be established either by direct evidence or reasonable inference that the gun was used by the child with the parent's knowledge."

to have foreseen that the boy *might*—I do not say *would,* but that he *might*—use the gun negligently? This appears to me to be the ultimate and crucial question in the case. . . . However, no one individual can determine what would be done by this hypothetical creature [a reasonable man] under any given state of circumstances otherwise than by his own experience, and, as the experience of one man usually differs from that of another,[16] our law wisely says that what is 'reasonable' is to be determined by the jury—that is, it is to be the resultant of the, to a certain extent, varying opinions of twelve different persons . . . ."

The precise question herein presented is one of first impression in this Court, although somewhat similar situations have been presented in the Superior Court. In *Swanson v. Crandall et al.,* 2 Pa. Superior Ct. 85, the defendant father kept a loaded revolver in the upper drawer of a chiffonier located in a bedroom occupied by his wife and small child; the defendant's 5 year old daughter discovered and discharged the revolver wounding a nursemaid. The Superior Court held that the facts did not constitute a basis for recovery by the nursemaid. The *Swanson* decision might be distinguished upon the ground that there was no evidence that the child obtained the revolver from the drawer— the place where the defendant kept it—on the day of the accident; however, the language of this decision indicates that the father's act in keeping a loaded revolver in a place where its discovery and discharge by the child could be reasonably anticipated was not neg-

---

[16] In that case a judgment for defendant was appealed to the King's Bench Division (Ireland) on plaintiff's motion to set aside the directed verdict; the King's Bench Division by a 2-1 vote set aside the judgment and entered judgment for plaintiff; the Court of Appeal (Ireland) sustained the view of the majority of the King's Bench Division.

352

ligent and to that extent the decision in the *Swanson* case must be rejected. In *Archibald v. Jewell*, 70 Pa. Superior Ct. 247, a father allowed his son to use a device loaded with BB shot and the boy discharged the device and wounded another child; the Court considered the question of the father's negligence in knowingly permitting his son to possess and use such a device to be a question of fact for a jury to determine.

*Mendola et al. v. Sambol*, 166 Pa. Superior Ct. 351, 71 A. 2d 827, is very apposite. In that case the defendant-father kept a .22 calibre repeating rifle in his home; on the evening in question the father and a 11 year old son were going hunting for rats; while the father performed some chores he placed the gun unattended behind the living room door; the son found the gun, took it to the car in readiness for the hunting trip and then proceeded to demonstrate the operation of the gun to a 7 year old child and the gun was discharged injuring the child. In upholding a verdict for plaintiffs, the Superior Court found that the defendant was negligent and such negligence was the natural and probable cause of the accident "since it was the natural and probable consequence of his negligent act in making the loaded gun accessible to his son." It is particularly significant that the Court recognized that there "are few things as attractive to a young boy as a gun" and that, both before and since the Restatement of the Law of Torts, it was the accepted rule that a father's conduct in permitting his child to have access to a dangerous instrumentality and the child's use of it to the injury of another may be negligence depending on the circumstances. In *Fleming et al. v. Kravitz*, 260 Pa. 428, 103 A. 831, a 6 year old boy was playing with a toy air gun in the barrel of which was the stem of an ordinary match; the boy discharged the gun with the result that the match struck the eye of another boy

causing an injury. This Court, upholding a nonsuit, said that the alleged negligence—in permitting the boy, immature and inexperienced, to be in possession of the gun, after warning from several persons who knew no more than he did that danger of an accident attended such indulgence on his part—did not involve the father in the accident.

Under the circumstances herein presented the question of Bach's liability was clearly for the jury to determine. The jury having found that he was negligent, and the evidence being sufficient to sustain such finding, judgment n.o.v. was properly refused.

The Bach Estate argued that the trial judge erred in refusing to sever the two actions for trial, especially in view of the Act of 1887, supra, which rendered inadmissible the testimony of Kuhns and Brugger as against the Bach Estate. When Kuhns' and Brugger's testimony were offered the Court very clearly instructed the jury that they were not to consider such testimony in determining the liability of the Bach Estate. In the trial judge's charge this question was again discussed and the jury was warned that Kuhns' and Brugger's testimony were not to be considered; the trial judge then said: "It will be necessary for you to determine the liability as to him [Bach], from testimony given otherwise than by Albert G. Kuhns and George A. Brugger as to events during the lifetime of George W. Bach." The instruction in this respect could not have been more clear. The liability of the Bach Estate was not dependent on the testimony of Kuhns and Brugger: as the Court below said in its Opinion: "Eliminating the testimony of Kuhns and Brugger under the direction of the court, the jury had more than sufficient facts and inferences from which to determine Bach's responsibility and liability. In addition to the facts previously herein recited Dr. Ray H. Luke

testified that about fifteen minutes after the accident he made an examination of the plaintiff, who he found at the foot of the dresser with a bullet in his chest and blood on the floor near him. The defendant Bach's gun was at the time on top of the dresser with bullets in it. After the accident Bach admitted to the policeman that he always kept this pistol in the dresser in a holster with loaded bullets in a clip inserted in the handle of the pistol but without a bullet in the chamber."

The Bach Estate, moreover, did not present this question in the statement of questions involved. In line with our well established rule this argument which related to a question not presented in the statement of questions involved should not be considered on this appeal: Rule 35, Rules of the Supreme Court of Pennsylvania: *Kerr v. O'Donovan*, 389 Pa. 614, 630, 134 A. 2d 213; *Blue Anchor Overall Co. v. Pa. L. Mut. Ins.*, 385 Pa. 394, 402, 123 A. 2d 413; *Burke Appeal*, 378 Pa. 616, 108 A. 2d 58.

In behalf of their motions for a new trial, both defendants allege trial errors, all of which we have considered. We see no merit in the contention that the Bach Estate was prejudiced in the eyes of the jury because, in his opening statement to the jury, counsel for the plaintiff said that Bach was the president of the American Sterilizer Company. The judge instructed the jury that Bach's position had nothing to do with the issue. Nor was the Bach Estate prejudiced to its harm because the jury panel was asked whether any of them were stockholders or employees of the American Sterilizer Company.

The appellants find fault with various remarks made by plaintiffs' counsel in his summation to the jury. We see nothing in those utterances which go beyond what is generally heard in zealous partisan arguments to juries.

The difference between allegata and probata alleged by the appellants finds no basis in fact.

It is contended further that the Court's charge was inadequate and misleading both as to negligence and contributory negligence features. Counsel in their briefs quote various portions of the Court's charge and consider them as isolated from the remaining parts of the charge. Without conceding that any particular statement made by the judge was improper or incorrect, we are convinced that taking the Court's charge as a whole it properly propounded the law applicable to the particular circumstances under discussion.

The appellants submit also that the trial judge erred in sending out a memorandum with the jury on possible verdicts. The evidence introduced on expenses incurred and to be incurred was voluminous and intricate. The memorandum was given for the purpose of guiding the jury, and was in no sense a direction as to what they should do. We find no fault with the lower Court's explanation, as given in his opinion: "The first item on the memorandum suggested the verdict for the defendants in case there was no right of recovery because neither defendant was guilty of negligence or the plaintiff was guilty of contributory negligence. The breakdown of the various possible verdicts if a recovery was to be allowed was in the court's opinion necessary, and it was proper. An examination of that memorandum will indicate the difficulty the jury would have had in correctly considering and allocating the many items involved under the testimony."[17]

---

[17] The use of memoranda is not without precedent: *Pa. Co., etc. v. Phila. Elec. Co.*, 331 Pa. 125, 134, 200 A. 18; *Armstrong & Latta v. City of Philadelphia*, 249 Pa. 39, 49, 94 A. 455; *Pittsburgh v. Pittsburgh Railways Company*, 234 Pa. 223, 235, 236, 83 A. 273; *Little Schuylkill Nav., R. R. & Coal Co. v. Richards's Admr.*, 57 Pa. 142.

Finally, it is argued that the verdict was excessive. The jury returned a verdict in the sum of $36,764 for the parents and $145,332 for the minor plaintiff. The Court below reduced these amounts to $30,104.60 and $86,500, respectively, a total reduction of $65,491.40. The evidence justified the final judgment as entered by the Court after the plaintiffs had filed appropriate remittiturs. Without entering into details as to Albert Kuhns' injury, disability, and incapacity, it is enough to say that, as a paraplegic victim of a gunshot wound, with his spinal cord severed, his lower organs uncontrollable, and his pedal locomotion destroyed, he has practically nothing to look forward to in life economically, and very little to expect in the way of physical comfort and happiness. An indication of his total helplessness, and the reasonableness of the verdict, as reduced, can be gained from the following portion of the lower Court's Opinion: "It is further contended that the court erred in permitting the jury to consider as an item of damages $2400.00, the cost of an 'ell' added to the plaintiff's home for his convenience and to permit him by the installation thereof to do many things for himself which would otherwise require more constant attention at additional expense. The testimony was that this installation was made at cost and without profit to the contractor. Dr. Keck stated that with this room and the equipment in it the plaintiff could without help get in and out of his bath and with the installed crane and pulley also move into the bed and to a commode. Pictures in evidence show the real necessity and usefulness of the installation. Bathing was necessary to remove muscle spasms which frequently and unexpectedly occurred. The doctor stated that this facility furnished better medical care and rehabilitation and saved expense. The court charged, 'If you consider this item reasonable, you may allow it as you

would a brace. If you consider it was not reasonable under all the circumstances, then you may like any other item, eliminate it.' We find no error on this point."

Strangely enough, the Bach Estate, while arguing that the verdict was excessive, complains as to the manner in which the lower Court reduced the verdict: "By way of illustration of the arbitrary manner in which the reductions were made by the lower Court, attention is called to the Court's conclusion that the award for minor plaintiff's food and education expenses and care should be reduced from the aggregate of $75,175.40 awarded by the jury to $47,540.00."

We find no error which would justify a retrial of this case, and the judgment is accordingly affirmed.

Mr. Justice COHEN dissents.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

Plaintiffs sued young Brugger and subsequently amended their complaint to join his grandfather's estate. The motion for judgment n.o.v. raises an important question: Did plaintiffs prove that George W. Bach, the deceased grandfather, was negligent in leaving a loaded revolver in the top bureau drawer of his bedroom, or, expressed another way, did plaintiff prove a want of due care under the circumstances of this case?

Albert G. Kuhns, 12 years old, was wounded on July 23, 1953, by a bullet from a pistol discharged by his 12 year old cousin, George A. Brugger, while in the bedroom of their grandfather, George W. Bach, in his cottage in an isolated part of the country along the shores of Lake Erie. The boys were visiting their grandfather

as they had for several summers.* At the time of the actual shooting, the boys, a two year old sister, and a great-aunt were alone in the cottage. Brugger picked up and pointed at Kuhns a combination shotgun and rifle; fortunately the great-aunt of the boys entered the bedroom and ordered Brugger to put away the gun, which he did. He had been previously warned by his grandfather not to touch any gun. We note, parenthetically, but importantly, that the Commonwealth of Pennsylvania issues a hunting license to 12 year old boys to carry a loaded gun and go hunting if accompanied by an adult. Brugger later returned to his grandfather's bedroom and found in the top left-hand bureau drawer a Colt automatic pistol which was loaded.** Brugger then negligently or accidentally shot his cousin. Was the grandfather guilty of negligence; was he guilty of a lack of reasonable care when he, a very old man living alone in an isolated part of the country—where thefts and burglaries in neighboring estates were well known to Bach and the State Police—kept in his top bureau drawer a loaded pistol in order to protect himself from burglars, robbers and prowlers?

A man's home is no longer his castle, but until today it has been the home of himself and his family. Ever since early Biblical times, in nearly every civilized part of the globe, except recently in Communist countries, the "family" has been the most important and the most sacred thing in life except God. The family unit

---

* Mr. Bach's daughters, the parents of the two minor children involved, had also visited Mr. Bach each summer and they undoubtedly knew, as did the boys, that he owned and kept various guns and other firearms in his bedroom in his one story cottage.

** It is clear from the law, as *extended* by the majority, that it would not have made any difference whether the pistol was loaded, or the cartridges were in a box near the pistol.

or entity is created and revered, the family life and love are developed, preserved and solidified when children and grandchildren are allowed in every room of the ancestral home and are treated as one. Children and grandchildren who are forbidden to enter or are locked out of the bedroom of their parents or grandparents will lose the comradeship, the trust, and part of the love they would otherwise have for their parents and grandparents, just in an era when the home, the family life, family discipline, ties, comradeship and love, are so greatly needed in the world in which we live. These can only be produced by a family home which the majority, by their present opinion, are now gravely undermining and disrupting. Moreover, in order to accomplish this very regrettable result, the majority—notwithstanding the tremendous research and the excellent presentation of their views by Mr. Justice BENJAMIN R. JONES—have had (1) to stretch and strain the measure or standard of due care, and (2) to candidly *overrule* a decision of this Court, namely, *Fleming v. Kravitz,* 260 Pa. 428, 103 A. 831, and a decision of the Superior Court of Pennsylvania, namely, *Swanson v. Crandall,* 2 Pa. Superior Ct. 85, and (3) to equate a loaded gun lying along the path by an open road while the owner went to his home to read the newspapers, with a loaded pistol kept in the top bureau drawer of a bedroom in a man's home to safeguard his life.

The majority decision of necessity will require a parent and grandparent to keep under lock and key (and keep the key constantly in his or her pocket) every revolver, carving knife, butcher knife, and every possibly-dangerous household article, as well as every medicine closet, in order to be legally safe from suit by a member of the family or one of their young playmates. If, for example, a burglar or robber entered a

man's home at night and he awoke, he would have to try to recall where he had hidden the key, get up in the dark, find it, unlock the drawer and finally get out the pistol, in order to defend himself or his property. By that time it would have been, in many instances, too late to defend himself or to capture the burglar. The present decision will also generate a tremendous number of law suits which will literally bankrupt young married couples who today have no maid or servant to aid them in tending to the children, their home, the cooking, and everything connected with home life. A mother necessarily leaves carving knives, butcher knives and other similar articles attractive to young children on the kitchen table or around their home where the children and their young friends constantly play, while she finishes cooking the meat, arranges or waits on the table, or answers the telephone or the door. Inevitably a child will accidentally or negligently or unwittingly injure a playmate. The law has never heretofore imposed such an unreasonable, unwise, impractical and unsalutary standard of care on the owner of a home or the head of a family. Indeed, this Court has just handed down an opinion in *Karen Parks v. Helen Parks*, 390 Pa. 287, 135 A. 2d 65, in which it holds that it is *against public policy* to allow a minor child to sue a parent "for acts of negligence affecting the person" of the child. Why shouldn't the same wise public policy apply to a grandfather, especially when the child was injured by a third person's tortious act which was committed in the grandfather's bedroom in the family summer home?

I would hold as a matter of law that, from a legal, practical, family and public-policy point of view, Bach was not guilty of negligence and I would enter a judgment n.o.v. as to the executor of the will of George W. Bach.

If a judgment n.o.v. is not entered as to Bach, it was not only a palpable, it was, for several reasons, a gross abuse of discretion not to grant a new trial: (1) Because plaintiffs' counsel in his opening remarks to the jury, which he continually emphasized by his examinations of prospective jurors on their voir dire, (and in his closing remarks to the jury) stated that "Bach was President of the American Sterilizer Company, which probably is one of the largest manufacturers of sterilizers in the United States" thus inevitably influencing and prejudicing their minds with the wealth of the defendant; and (2) because of the memorandum as to damages improperly sent out to the jury; and (3) because of the trial Judge's failure to charge on the important issue of the plaintiff-parents' contributory negligence; and (4) *especially because the trial Judge's refusal to sever the two actions for trial made a fair trial for Bach a "practical" impossibility.*

Why was a fair trial for Bach a "practical" impossibility? The evidence in the case which was admissible against Bach alone and all the reasonable inferences therefrom, amounted (at best for plaintiffs, according to the majority's view of negligence), to slightly more than a scintilla. In spite of this the trial Court admitted, in this joint trial, evidence which was admissible against Brugger but not against Bach; and this inadmissible evidence as to Bach was *so much stronger* than the scintilla of legally admissible evidence (against Bach) that it could not fail to prejudice the jurors against Bach, and could not possibly be eliminated from their minds when they came to decide Bach's due care or want of due care.*

---

* A number of decisions of this Court would seem to hold that this evidence is inadmissible in a joint trial. The principle is thus summarized in the syllabus of *McShain v. Indemnity Insurance Co.*, 338 Pa. 113, 12 A. 2d 59, "In a case involving co-parties, a

362

The majority say "When Kuhns' and Brugger's testimony were offered the Court very clearly instructed the jury that they were not to consider such testimony in determining the liability of the Bach Estate." This is theoretically unobjectionable, but nearly every judge knows that *in reality* it is "impractical" and "impossible". A familiar concrete example will more forcefully illustrate the majority's unrealistic position. When a man is tried for murder, evidence of an entirely unrelated crime is admissible in order to aid the jury in determining, *not his guilt,* but the penalty to be inflicted if their verdict is murder in the first degree. Every trial judge explains the limited purpose of such testimony; but nearly every trial and appellate court judge knows, and I venture to express my belief that every Judge in this Court believes that it is *in reality* impractical and *impossible* for the jury not to be influenced by such testimony in determining the guilt or

declaration normally admissible against one of them should be excluded from evidence where the necessary result of its admission would be to prejudice the rights of the other co-party, against whom it is not admissible, even though the party offering it is thus precluded from the exercise of a right he would have had if the proceeding were against the declarant alone." This principle is thus stated in a footnote in *Bergen v. Lit Brothers*, 354 Pa. 535, 539, 47 A. 2d 671, "So firm is this rule that, where there are two defendants on the record, and evidence, though properly admissible against one, is not admissible against the other and would serve greatly to prejudice the latter's rights, it must not be admitted even though the plaintiff offering it is thus precluded from the exercise of a right he would have had if the proceeding had been only against the one defendant: McShain v. Indemnity Insurance Co. of North America, 338 Pa. 113, 119, 120, 12 A. 2d 59, 61, 62." See to the same effect: *Goodno v. Hotchkiss*, 237 Fed. 686, 696; *Windham v. Howell*, 78 S. C. 187, 194, 195, 59 S. E. 852, 854, 855; *Continental Insurance Co. v. Delpeuch*, 82 Pa. 225, 233; *Lacock v. Commonwealth*, 99 Pa. 207; *Dickinson College v. Church*, 1 W. & S. 462, 465.

innocence of the defendant.** If the evidence of an *unrelated* crime is, as we all believe, sufficient to influence and prejudice the jury in determining criminal liability, i.e., guilt or innocence of murder, isn't it clear that this jury could not fail to be unconsciously but unjustly influenced and prejudiced against Bach by the direct and the relatively very strong testimony proving Brugger's negligence and incidentally, even though inadmissible against Bach, Bach's negligence (if the majority's theory is adopted)!

The majority's refusal of a new trial is untenable. The majority say that *if you eliminate the testimony of Kuhns and Brugger,* the jury still had sufficient, although barely sufficient facts (and inferences therefrom) to justify a verdict of negligence against Bach. That would be the proper test in considering, not a new trial, but an n.o.v. Nevertheless, in sustaining the lower Court's refusal of a new trial, the majority now unwittingly apply the legal test for an n.o.v. instead of the test for a new trial. The basic question on this point is not whether, eliminating the inadmissible testimony of Kuhns and Brugger, there was barely sufficient evidence to fasten negligence upon Bach—the question is whether, when you take a scintilla of evidence of negligence and pile upon it (relatively) strong and direct *inadmissible* evidence of (under the majority's theory) negligence, you can justify a failure to grant a severance and a new trial by applying the test which is applicable only in questions involving n.o.v., namely, were there sufficient facts and inferences therefrom to justify a verdict?

---

** I venture the further belief that every member of this Court would like to see the Legislature change the rule so as to permit the introduction of evidence of an unrelated crime only when and after a jury has found a defendant guilty of murder in the first degree.

The majority also cite the general rule (Rule 35)* that since the question of severance was not presented by appellants in the statement of questions involved, it should not be considered on this appeal. It was strongly urged at the trial and in the written motion and argument for a new trial. No objection to a consideration of this question was made in this Court (nor of course in the Court below) by any of the parties. Moreover, it is the duty of this Court, which it has often followed, to render a decision in accordance with the merits and justice of the case: Act of May 20, 1891, §2, P. L. 101, 12 PS 1164; and "[where] there has been some basic or fundamental error seriously affecting the merits of the case and imperatively calling for reversal" we have never failed to grant a new trial, even if it involved disregarding a technical rule of Court or any other technicality: *Commonwealth v. Schultz,* 170 Pa. Superior Ct. 504, 512, 87 A. 2d 69; *Commonwealth v. Klick,* 164 Pa. Superior Ct. 449, 453, 65 A. 2d 440; *Commonwealth v. Kahn,* 116 Pa. Superior Ct. 28, 30, 176 A. 242; *Commonwealth v. Zang,* 142 Pa. Superior Ct. 573, 577, 16 A. 2d 745. See also: *Fries v. Ritter,* 381 Pa. 470, 476, 112 A. 2d 189; *Downes v. Hodin,* 377 Pa. 208, 104 A. 2d 495; *Falk & Co. v. South Texas Cotton Oil Co.,* 368 Pa. 199, 82 A. 2d 27.

Two additional reasons make the granting of a new trial even more imperative. The memorandum as to liability and damages (for the parents, and for Albert for pain, suffering, humiliation and embarrassment, etc.) which the trial judge sent out to the jury, was, in my opinion, unfair and undoubtedly prejudicial. Furthermore, Kuhns' father and mother recovered a verdict, in accordance with said memorandum, of over

---

* ". . . *ordinarily* no point will be considered which is not thus set forth in or necessarily suggested by the statement of questions involved."

$36,000 for expenses incurred to date of trial, expenses to be incurred until their boy arrived at the age of 21 years, and damages for loss of earning capacity, in spite of the fact that they could have been guilty of contributory negligence in failing to prohibit their son from entering or warning their son not to enter into his grandfather's room in his absence or to touch his guns or pistol; and consequently would not be entitled to recover anything.* Yet neither in the charge of the Court, nor in the memorandum sent out by the judge to the jury was anything said (or written) to permit the jury to pass upon this important question of the parents' contributory negligence.

For the aforesaid reasons I would enter a judgment non obstante veredicto in favor of the Bach Estate. If a judgment n.o.v. is refused, I would grant a new trial *in the interest of justice,* because the dismissal of the motion for a new trial by the Court below constituted a palpable and gross abuse of discretion.

---

*Today everyone is being held responsible for the acts or misconduct of minor children except their parents who, in many cases, are primarily, if not solely, to blame. I strongly disagree with this philosophy.