CHARLES P. SALISBURY, p. a. *vs.* ANGELO CRUDALE.

JANUARY 16, 1918.

PRESENT: Parkhurst, C. J., Sweetland, Vincent, Baker, and Stearns, JJ.

*(1)  Exceptions.*

An exception to a charge as a whole will not lie.

*(2)  Negligence.  Firearms.*

In a personal injury action arising out of a gun shot wound caused by minor son of defendant, the facts tended to show that the son knew of his father's ownership and use of the gun; that the son was never instructed or warned by his father as to the danger of using the gun and was never forbidden to use it; that the father never took any precautions until as he claimed at a certain time he broke the stock of the gun and threw the metal portion and the broken stock under his bed, for the reason as he stated, he was afraid some children would get hold of it and scare someone, and that the father left a cartridge in the gun.

*Held*, that whether the father was negligent and whether his negligence caused the injury to plaintiff was properly left to the jury and upon the above facts the jury could properly find for the plaintiff on both points.

TRESPASS ON THE CASE for negligence. Heard on exceptions of defendant and overruled.

PARKHURST, C. J.   This is an action of trespass on the case for negligence, brought by the plaintiff, a minor between ten and eleven years of age at the date of the injury (October 25, 1915); the suit is brought, through the father as next friend, against Angelo Crudale, the father of a boy who is named Americo Crudale, and who at the date of the injury was between twelve and thirteen years old.

The declaration alleges in substance as follows:   that on October 25, 1915, the plaintiff was going from school in the city of Cranston to his home in Cranston by a way through certain property known as the "Charity Lots," permitted to be used by school children;   that the defendant on and prior to October 25, 1915, was the owner of a gun by which bullets were discharged and then had a minor son named Americo Crudale, about thirteen years old.

The declaration then alleges:   "That the defendant then and there owed the public a duty not to suffer or permit his said minor son to gain or to have possession of said gun, rifle or other firearm then and there possessed by the defendant as aforesaid, in such a way and under such circumstances that said minor son might inflict injury upon the public and upon this plaintiff in particular by using or attempting to use said gun, rifle or other firearm; that the defendant wholly neglected and violated his said duty in this that he suffered and permitted his aforesaid son to become and to be possessed and to have possession of the aforesaid gun, rifle or other firearm, together with certain leaden bullets or cartridges, and further permitted his said minor son to go upon the aforesaid charity lots as above described and owned upon which the plaintiff was then and there travelling, armed with said gun, rifle or other firearm and said bullets or cartridges and further suffered and permitted his said minor son to use and to fire one or more of said bullets or cartridges in and through said gun, rifle or firearm upon said charity lots while the plaintiff was travelling thereon as aforesaid."

Plaintiff further alleges in substance that defendant's minor son fired a bullet through the gun, the bullet struck the plaintiff in the thigh or hip and lodged in the plaintiff's body, and caused the injury complained of, claiming permanent injury; the suit is to recover for this injury to the plaintiff.

The case was tried before a Judge of the Superior Court and a jury in Providence, on January 31, February 1,1917, and the jury returned a verdict for the plaintiff in the sum of $892.

The defendant did not file any motion for a new trial, but in due course prosecuted certain exceptions to this court, based upon the rulings of the trial judge; the only exceptions now urged before this court are an exception to the ruling of the trial judge denying a motion, made by defendant's counsel at the conclusion of all the testimony, for the direction of a verdict for defendant; and an exception noted by defendant's counsel "to the entire charge of the court."

(1) As to this latter exception this court has repeatedly held that an exception to the charge as a whole will not lie, and will not be considered. *Ralph* v. *Taylor*, 33 R. I. 503; *State* v. *Wagner*, 86 Atl. 147; *Newton* v. *Weaver*, 13 R. I. 616; *State* v. *Sheehan*, 28 R. I. 160.

Therefore there is only one exception before the court to be considered, viz.: that based upon the denial of the defendant's motion for the direction of a verdict in his favor, after all the evidence was in.

It is necessary for us, therefore, to determine whether upon all the evidence, the jury could find the defendant guilty of such negligence as would render him liable for the injury suffered by the plaintiff.

So far as the time, place, manner and result of the injury to the plaintiff is concerned there is no substantial dispute. It appears that the plaintiff, who was then about ten years old, at about 4:30 o'clock on the afternoon of October 25, 1915, was coming, with several boys of about his own age, from school and going in the direction of his home, by way

of a path through some lots known as the "Charity Lots," in the city of Cranston; that these lots lie along and near a stretch of woods; that plaintiff and his companions were playing marbles together as they went along the path; that Americo Crudale, the defendant's son, who was then about thirteen years old, with a companion named Carnavale, came from the woods toward the plaintiff and his companions, and then had a gun in his hands; that when Americo came near to the plaintiff and his companions, he said to them, "Run, or I'll shoot you," or "Hurry up" or "Run," as variously related by the plaintiff and his companions, at the same time aiming the gun in the direction of the boys; that the boys did not run or hurry but walked away and were about thirty feet from Americo when he fired the gun, and a bullet therefrom struck the plaintiff in the left buttock and penetrated the flesh and muscles of the thigh, lodging therein; it further appears that the bullet was never removed; that the wound caused considerable pain and suffering and the evidence tended to show a recurrence of pain to the date of trial and the probability of its recurrence for an indefinite time thereafter, and that his activity in the use of his leg is much impaired. No question as to the amount of the damages awarded by the jury is before us upon this record.

The gun used was produced in evidence and is now before us; it appears to be, as described in evidence, of 22 calibre and a breech loader; and the wooden stock appears to have been broken away from the lock, and to have been replaced and rejoined to the lock by means of a common screw with a nut, and a nail, so as to permit the gun to be held and aimed in the usual way; but it appears from the evidence and by inspection of the gun before us that the breaking of the stock (which defendant testified that he did himself) did not in any way disable the metal part of the gun; on the contrary the barrel, the lock, hammer, trigger, *i. e.*, the operative parts of the gun appear intact and in a serviceable condition, so that the gun could have been loaded, aimed and discharged even if the stock had not been mended.

The defendant's story is that he formerly lived in Providence up to May or June, 1915, when he moved to Cranston; that while living in Providence he was troubled by rats, and bought this gun here in evidence for use in shooting rats; that after he moved to Cranston in May or June, 1915, he was not troubled by rats and did not use the gun for shooting rats; that on July 4, 1915, having some cartridges left, he shot them all off on that day and never purchased any more; that after July 4, 1915, he never used the gun again; he testified: "18 Q. What did you do with this gun after you moved to Cranston?  A. After a couple of months, I broke it, after the 4th of July.  19 Q. What did you break it for?  A. I am afraid somebody get hurt of it, see?  I didn't do any more,—last time I used it was the Fourth of July.  I had no rats in the country here and I spoil the gun for fear it might scare somebody, you know.  20 Q. What did you do with the gun after you broke it?  A. Threw it under the bed.  21 Q. What bed?  A. My bed."  He had previously testified that he had eight children.  He further testified that he never saw the gun again, until after the shooting here related; that he did not buy it for his son, that he did not permit his son to use it, did not know that he ever used it; and it is to be inferred from his testimony and that of his son that he never gave his son any instruction or caution as to the use of the gun or as to the danger of using it; it is shown that the son knew that the father had this gun in his possession, for the son testified that he had used the gun, without his father's knowledge, once before the Fourth of July, 1915, to shoot at tin cans in the yard; that he saw the gun with the broken stock under the father's bed a couple of days before the shooting of the plaintiff; that on the day of the shooting, about two o'clock, p. m., he took the gun and the broken and detached stock from under the bed, himself repaired the stock, attaching it to the lock by means of a screw with a nut and a nail, then took it away from the house, and proceeded thereafter with his companion, Carnavale, to the "Charity Lots," where

the shooting took place. As to the shooting he testified: "30 Q. Now how did you happen to shoot Charles Salisbury? A. I went down in the hollow and when these boys came along I said, 'We will have some fun,'—so when they came along there were two in front and a crowd behind. I said to the two in front 'Hurry up,' and when the crowd came along they stopped and looked at me. They began talking, and that boy there, Earl Wiberg, I think, said, 'If you shoot we got a lot of witnesses.' Well, with that Tony Carnavale said, 'Shoot at the fence,' and I said it wasn't loaded and I had it like that (illustrating) and shot it and one of the boys fell. 31 Q. When you fired Charles Salisbury fell. It was little Charlie Salisbury? A. Yes. 32 Q. Did you have any cartridges with you that day? A. No, sir.'" He further testified that he did not know that the gun was loaded when he fired it; that the only cartridge he had was the one that was in the gun; that he did not put it there; that it was in the gun.

The boy Americo Crudale was arraigned soon after the shooting and before this suit was brought, before the Eighth District Court in Cranston, on complaint for assault with a dangerous weapon. The mother of the plaintiff testified that she was present when Americo was examined before the judge on that arraignment; that he then stated in answer to a question from the judge as to where he got the gun, that "his father gave him the gun, his father bought it, his father got him to shoot tin cans in the yard." She reiterated this statement on cross-examination, and said positively that the boy stated that his father bought the gun and cartridges and gave them to him; and that the father was present in court at the time of the statement, and that he did not then deny it. It is fair to state, however, that both the son and the father in their testimony now before us denied both the making of the statement and the fact. There is also other evidence tending to show that Americo Crudale had been seen shooting at tin cans in the yard, and at a squirrel in the woods; Americo admitted the shooting at tin cans on one

occasion, but denied the shooting at a squirrel in the woods, or any shooting in the woods.

The case was submitted to the jury in a short but clear charge, in which the jury was instructed in substance that the defendant was not liable for his son's negligence merely because he was the father of the boy who did the shooting; but that the father was responsible only for his own negligence, if in fact the jury found that he was negligent in leaving the gun where the son could find it and use it, or in giving the gun to his son to use, and if the son was not of sufficient age, experience and discretion to be entrusted with a gun. The whole question whether the father was negligent and whether his negligence caused the injury to the plaintiff was fairly left to the jury. No special instructions were asked on behalf of the defendant, and no exception to the charge was taken except the general exception to the entire charge above referred to, which as we have shown was not a valid exception.

In our opinion the jury could find upon the evidence that the defendant was negligent and that his negligence was the cause of the injury to the plaintiff; they could find that the son knew of his father's ownership and use of the gun; that the son was never instructed or warned by his father as to the danger of using the gun, and was never forbidden to use it; that the father in using the gun for shooting rats and on the Fourth of July, 1915, must have so used it in the presence of some or all of his children, and that there was no evidence to show that he ever instructed any of them as to its use or forbade its use by them or took any precautions, until, as he claims, after the Fourth of July, 1915, he broke the stock from the gun, and threw the metal portion and the broken stock under his bed, for the reason, as he says, as above quoted, "I spoil the gun for fear it might scare somebody;" and again in cross-examination, as a reason for breaking the stock and throwing it under the bed, he says, "Afraid some kids would get hold of it and scare somebody." From this testimony the jury could find that while the defendant

appreciated the possibility that his children might find and misuse the gun, his breaking of the stock from the gun did not so disable the gun as to make it harmless, and that his throwing the gun under the bed was not such a concealment of the gun as effectually to remove it beyond the reach of his children or any of them. From the testimony of the defendant and his son Americo Crudale, that the defendant had discharged all the cartridges he had on July 4, 1915, and never bought any more; that the son when he took the gun on October 25, 1915, had no cartridges in his possession, other than the one which proved to be in the gun and was discharged by him that afternoon, and which he did not know to be in the gun until he fired it, the jury could find that the defendant did not in fact fire off all the cartridges he had on July 4, but that he negligently left a single cartridge in the gun, and that he neither then nor thereafter took the precaution to examine the gun as he might have done by pulling down the breech block to see that the gun was empty; in other words, the jury could find upon all this evidence that the defendant was negligent in leaving a loaded gun under his bed, a place which he in the exercise of reasonable judgment should have known to be, as it was proved to be, accessible to his son; and the jury was warranted in the conclusion that the defendant's negligence in all these respects was the *causa causans* of the injury to the plaintiff.

In its legal aspects the case at bar is quite analogous to the case of *Dixon* v. *Bell*, (1816) 5 M. & S. 198. (See also 1 Starkie, 287; 1 Holt 233); this case was approved in *Sullivan* v. *Creed*, (1903) 2 Ir. (K. B. D.) (1904) 317, the principles of which, as well as the facts, are closely analogous to principles and facts involved in the case at bar.

In the case of *Sullivan* v. *Creed, supra,* the facts proved at *nisi prius* at Cork Assizes are stated to be as follows, p. 317-318: "On the 10th of August, 1902, the plaintiff was returning home from Mass by a public road which passed the defendant's lands. On his way he met Daniel Creed,

a son of the defendant, aged between fifteen and sixteen, and two other boys. Daniel Creed left them at a gap leading to the defendant's house. This gap consisted of two pieces of deal, with a narrow passage between, level with the road, and from the gap a private path led to defendant's house, forming a short cut to it. The plaintiff and the two other boys continued along the high road, and had gone about 25 yards when the plaintiff heard Daniel Creed, who had come back to the highroad, cry 'Hi, lads.' The plaintiff looked around, and saw a gun in Daniel Creed's hands pointed towards him. The gun went off, and the plaintiff was hit in the eye, and in consequence lost the eye. The plaintiff stated in his evidence that he heard the defendant say that in the morning he went out to shoot rabbits, but got none, and that he met a couple of neighbors and walked along the road with them, and then went to a cottage and read a paper, and before going left his gun. The plaintiff's mother stated she heard the defendant say that he went and took his gun; that he loaded it, and that it was near the road; that he put the gun inside the stile out of his hand, and that it was on full cock; that he went along with two men to show them a field of 'spuds,' and then went to a cottage and remained there reading newspapers till the people were coming back from Mass, and after that coming out he heard the shot of a gun. Daniel Creed, the defendant's son, was called as a witness for the plaintiff, and stated: 'I saw the gun. It was up against the ditch near the gap. I saw it the moment I went in through the gap. I was fiddling with the gun; I did not know it was loaded; I was playing with it.' "

"The defendant called no evidence, and asked for a direction on the following grounds: 1. That the injuries arose from the wilful act of a third party of upwards of fourteen years of age, and that there was no legal liability on the defendant for the act of such a party. 2. That there was no legal duty on the part of the defendant towards the general public to guard against the boy obtaining possession of the gun. 3. That the injuries were not the reasonable and natural result of any failure of duty by the defendant.

"It was admitted on both sides at the trial that the question was one of law, and that it was desirable to take the opinion of the jury on the question of damages. The only question left to the jury was, to what damages was the plaintiff entitled, assuming that he was entitled in point of law to succeed. They found £50, and then by direction of Kenny, J., the jury found a verdict for the defendant, and the learned judge gave judgment for the defendant. It was agreed that the Court should be at liberty to draw all proper inferences of fact, and that if the verdict was changed the damages were to be £50."

The case was argued before three judges of the King's Bench Division (Ireland) on the plaintiff's motion to set aside the directed verdict, and to enter a verdict and judgment for the plaintiff, and it was held by two out of three judges of the King's Bench Division (PALLES, C. B., and GIBSON, J.; BOYD, J., dissenting) that the verdict should be set aside and a verdict and judgment entered for the plaintiff. In the course of his opinion, PALLES, C. B., in discussing the evidence and the question whether the defendant was negligent in leaving a loaded gun at full cock, in such a place, and the question whether defendant was bound as a reasonable man to foresee that his son, or any boy finding the gun, would use it negligently, says (p. 330):

"Lastly, I cannot think that it was beyond the province of a jury to hold that he might have foreseen that the taking of the gun by the boy would not have been an improbable result of his seeing it, in a place where there was not a parent or a person in authority to prevent him. I am, therefore, of opinion that a jury might well have found that the defendant ought, under the circumstances, to have foreseen that the boy *might* take posesssion of the gun. But even this is not necessary, for, in my opinion, the liability of the defendant would be the same if he ought to have foreseen that *any* boy, as distinguished from this particular boy, might have seen and handled the gun; and having regard

to the place in which it was placed, I think it would have been wholly impossible to have withdrawn from the jury the question whether he ought to have so foreseen.

"This alone, however, would not be enough. Ought he then to have foreseen that the boy *might*—I do not say *would*, but that he *might*—use the gun negligently? This appears to me to be the ultimate and crucial question in the case. No doubt the answer must be based upon the common experience of mankind as to what, under the circumstances, would be the action of that person of whom we so often speak, but who, to my mind, has no existence, save as an *ens rationis*—'the reasonable man.' However, no one individual can determine what would be done by this hypothetical creature under any given state of circumstances, otherwise than by his own experience, and as the experience of one man usually differs from that of another, our law wisely says that what is 'reasonable' is to be determined by the jury—that is, it is to be the resultant of the, to a certain extent varying, opinions of twelve different persons. But then the law, within the last century, laid down that before a Judge can submit to a jury the question what a reasonable man would do under a certain given state of circumstances, he himself should determine that the circumstances were such that they might reasonably arrive at a conclusion favorable to the party upon whom the onus lay. This is a question of law, and one that the Judge must determine from his own individual experience of life.

"I have no hesitation in saying that I would much prefer the opinion of a jury upon the subject to my own; but my opinion is that the defendant ought to have foreseen it. My reasons for arriving at this conclusion are the following:

"The possession of a loaded gun imposes upon the person who is in possession of it an obligation to use a much greater amount of care than would the possession of the same gun were it unloaded. Where there is any danger to human life, as there nearly always is in the unguarded use of loaded weapons, it is impossible to exaggerate the amount of care

thus imposed. Further, I am of opinion that a prudent person recognizes the necessity of this care, and regulates his conduct accordingly." . . .

"The defendant here was not entitled to act upon the assumption that whoever came into the possession of the gun would act with the highest degree of care. Had the defendant given his son the loaded gun, without informing him that it was loaded, and without bringing to his mind the circumstance which might impress him with the obligation of using the *maximum* of care, I would have held that the defendant ought to have foreseen that the boy might probably use it without that great amount of care which the fact of which he was ignorant imposed upon him. But if he ought reasonably to have foreseen that the boy might take the gun, without knowing it to be loaded, his liability for placing it in such a position as rendered such a result reasonably probable would, in my opinion, be identically the same as it would have been had he voluntarily given it into his possession without informing him that it was loaded.

"So much for the facts of this particular case. Now a few words as to the authorities.

"In *Dixon* v. *Bell* (1), the defendant kept in the house of one Leman, where he lodged, a loaded gun. When he left the house, he sent a mulatto girl, his servant, aged about thirteen or fourteen, for the gun, desiring Leman to give it to her, and to take the priming out. Leman did so, so told the girl, and delivered the gun to her. She, after a time, presented it, in play, at the plaintiff's son, a child of between eight and nine, saying she would shoot him, and drew the trigger. The gun went off, and destroyed one of the son's eyes. Lord ELLENBOROUGH, C. J., in charging the jury, asked them to consider two things: first, was such a degree of caution used by the defendant as to render the instrument safe in any hands? and secondly, if not, they were to consider whether the defendant was not guilty of negligence in trusting it to a servant of such an age, who, under all the circumstances was likely to make such a use of it as a person

of greater discretion would not have made. If upon the whole they were of opinion that the instrument in such a state ought not be have been entrusted to such a person, the plaintiff would be entitled to their verdict. A verdict having been had for the plaintiff, Lord ELLENBOROUGH, in refusing a rule for a new trial, said: 'The defendant might and ought to have gone farther; it was incumbent on him, who by charging the gun had made it capable of doing mischief, to render it safe and innoxious. This might have been done by the discharge or drawing of the contents; and though it was the defendant's intention to prevent all mischief, and he expected this would be effectuated by taking out the priming, the event has unfortunately proved that the order to Leman was not sufficient; consequently, as by this want of care the instrument was left in a state capable of doing mischief, the law will hold the defendant responsible.' BAYLEY, J., says: 'The gun ought to have been so left as to be out of all reach of doing harm. The mere removal of the priming left the chance of some grains of powder escaping through the touch-hole.'

"Upon the assumption that the defendant is under the same liability as if he had handed the gun to the boy, that case would be much stronger than the present, as the defendant here took no precautions whatsoever, and the question whether there was evidence that the injury was the reasonable consequence of the negligence, the sole matter relied on here, was in that case treated as too clear for argument. It was not even raised on the new trial motion.

"This case has ever since been treated as a leading one; it is discussed in every book on Torts; has been cited in innumerable arguments. It has never been overruled, nor, as far as I am aware, ever judicially questioned."

The Chief Baron then proceeds to review a number of supporting authorities from the English courts which discuss the question of negligence of defendants under various circumstances where the immediate negligence of third parties intervenes, and concludes, p. 334: "Upon the

whole, my opinion is that the question was for the jury. I think the agreement at the trial was that if the Judge was wrong in directing the verdict for the defendant, it should be entered for the plaintiff; and even were it necessary that I should myself draw the inference of fact, I would have no difficulty in holding that the injuries were attributable to the defendant's negligence.

"I am therefore of opinion that the verdict should be entered for the plaintiff for the £50 damages assessed at the trial, and that judgment should be entered thereon, with costs."

The defendant then appealed to the Court of Appeal (Ireland) and after very full and careful consideration the three Lords Justices of Appeal sustained the view of the majority of the King's Bench Division.

This court is of the opinion that the two cases above quoted at length are of great weight and that they are clearly applicable in principle to the facts and circumstances of the case at bar; and we do not find that either of them has ever been doubted or overruled.

We find also upon plaintiff's brief certain cases decided in the courts of this country which support the same doctrine that in cases of this character the question of the negligence of the defendant is a question for the jury. *Brittingham* v. *Stadiem,* 151 N. C. 299 (1909) (citing with approval *Dixon* v. *Bell, supra); Meers* v. *McDowell,* 110 Ky. 926 (citing *Dixon* v. *Bell, supra); Binford* v. *Johnston,* 82 Ind. 426 (citing *Dixon* v. *Bell, supra* and other English cases cited in *Sullivan* v. *Creed, supra); Gerbino* v. *Greenhut-Siegel-Cooper Co.,* 165 App. Div. (N. Y.) 763; *Phillips·* v. *Barnett,* 2 City Ct. N. Y. 20; see also *Carter* v. *Towne,* 98 Mass. 567 (citing *Dixon* v. *Bell, supra,* and other English cases.

The cases of *Mullins* v. *Blaise,* 37 La. Ann. 92 and *Marion-neaux* v. *Brugier,* 35 La. Ann. 13, cited on plaintiff's brief are not here in point, because the liability of the father for the tortious acts of his minor son is governed by a pro-

vision of the Civil Code of Louisiana, and does not depend upon the negligence of the father.

We have not seen fit to review in detail the cases above cited; the circumstances vary from those of the case at bar, but they clearly support the principles to which they are cited; it would unduly extend this opinion to state them at length.

We have carefully examined all of the cases cited on behalf of the defendant; we do not find that any of them are in point on the facts here disclosed; nor do we find in any of them any statement of law which disturbs our conclusion as to the law applicable to the case at bar.

We are of the opinion that the case at bar was such, upon all the evidence, as must have been submitted to the jury, and that there was no error in the refusal of the trial judge to direct a verdict for the defendant.

Neither the weight of evidence nor the amount of the damages is before us upon this bill of exceptions.

The defendant's exceptions are overruled and the case is remitted to the Superior Court sitting in Providence with direction to enter its judgment for the plaintiff upon the verdict of the jury.

*John F. Collins, Philip S. Knauer,* for plaintiff.

*Anthony V. Pettine, Pettine & De Pasquale,* for defendant.