56 N.J. Super. 386 (1959)
153 A.2d 339
THOMAS STOELTING, PLAINTIFF-RESPONDENT,
v.
ANTHONY M. HAUCK, JR., AND VIRGINIA HAUCK, DEFENDANTS-APPELLANTS, AND SANDRA HAUCK, BY HER GUARDIAN AD LITEM, JOHN HAUCK, II, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 13, 1959.
Decided June 30, 1959.
*389 Before Judges GOLDMANN, CONFORD and FREUND.
Mr. Allen C. Mathias argued the cause for defendants-appellants, Anthony M. Hauck, Jr. and Virginia Hauck (Messrs. Smith, James and Mathias, attorneys).
Mr. C. Ryman Herr, Jr. argued the cause for defendant-appellant, Sandra Hauck (Messrs. Herr and Fisher, attorneys).
*390 Mr. Jules B. St. Germain, admitted pro hac vice, argued the cause for the plaintiff-respondent (Mr. Joseph D. Maher, Jr., attorney).
The opinion of the court was delivered by CONFORD, J.A.D.
On April 3, 1957, while a house guest and business visitor at the home of the defendants, Anthony M. Hauck, Jr. and his wife, Virginia Hauck, the plaintiff was seriously wounded by gunfire from a weapon in the hands of the defendant, Sandra Hauck, daughter of the other defendants, and 15 1/2 years of age at the time. In his amended complaint the plaintiff sued the minor defendant for negligence in discharging the firearm and the adult defendants for negligence in supervision of the girl with respect to firearms and in permitting the weapon with which he was injured to remain in a place accessible to her. The complaint also charges violation by the defendants of N.J.S. 2A:151-10, 11, as amended, making criminal the furnishing to or use by minors of certain ages of firearms under specified circumstances.
At trial in the Hunterdon County Court before a judge and jury plaintiff recovered a verdict against all three defendants in the sum of $100,000. A motion for a new trial based upon asserted trial errors and mistake in and excessiveness of the verdict was denied.
Plaintiff was 52 years of age when the shooting occurred. He was associated with the defendant, Mr. Hauck, in certain mining ventures, and had been a guest of the latter at his home in Clinton on many occasions, some of extended duration, over a period of years. For a number of months prior to April 3, 1957 his stays there were at the average rate of once or twice a week. He was married, but apparently separated from his wife, who was in California. A third associate in these mining ventures was one Rolf L. Meuer, who apparently lived at the Hauck home intermittently since March 1956. When the latter first came there he had with him a .45 caliber Colt revolver. For at least several *391 months prior to April 3, 1957 this weapon, loaded, was kept by Meuer in a paper bag in a desk in the second floor front bedroom of the Hauck home, which, for some appreciable time prior to the date mentioned, was occupied as a bedroom by Sandra. The revolver was removed from the desk only on Fridays, when a maid from Clinton Reformatory worked in the house.
Sandra had fired this weapon, but only once, on a previous occasion  at the firing range at the Annandale reformatory in the summer of 1956. She had gone there with friends, including a state trooper, to the knowledge of her parents. The previous evening Sandra had handled a number of firearms at the dinner table in the presence of the adult defendants. One of these was the property of Mr. Hauck.
Sandra had seen Meuer unload the Colt revolver and put it in the desk in her room about three weeks before the shooting incident. Mrs. Hauck had also seen the reovlver in the same desk at a time when that particular bedroom was being occupied by Meuer.
Sandra testified that she had handled other revolvers which were kept in the house, both at the Clinton home and at a farm from which they had moved some years previously, but in depositions admitted in evidence she testified she was "never taught anything about a revolver."
Plaintiff testified that in August 1956 he saw Sandra wearing a.45 Colt automatic, inferably Meuer's, on a belt in a holster while coming through the Hauck kitchen. He immediately told Mrs. Hauck that it was "very foolish" to let the girl go about carrying the .45, but her response was that "She [Sandra] knows what she is doing." Several weeks later he observed Sandra, accoutered with the same gun and holster, coming through the dining room of the house practicing "quick draws." She told him the gun was loaded, and he warned her to stop it, that it was "very foolish, dangerous." He took the matter up with Mrs. Hauck again, and she referred him to Mr. Hauck. The latter said, "Sandra *392 is not foolish with weapons," and "knows how to handle them."
Plaintiff introduced photographs in evidence which the jury could have found were taken by Mr. Hauck in the back yard of the house in the summer or fall of 1956, one showing Sandra photographing Mr. Meuer while wearing a hip holster and revolver, and another of her posing with a pointed weapon. The jury could have found from the testimony that this was a .38 "special." Mr. Hauck owned such a gun.
On the late evening of April 2, 1957 plaintiff and Mr. Hauck were conversing in the dining room on the first floor of the house. Plaintiff had come to the Hauck home on this occasion to attend a corporate stockholders meeting. It appears that about midnight the plaintiff, referring to his own wife, said something to the effect that "she's had her last chance to save her neck." Sandra had gone up to bed shortly before and may have overheard the remark and interpreted it as referring to her own mother. Plaintiff and Mr. Hauck, sharing the same bedroom on the second floor, about 25 feet from Sandra's, went up to retire about 1:00 A.M. The men were in separate beds and plaintiff had fallen asleep when he awakened to hear Mr. Hauck say, "Tom, were we not talking about Georgia [Stoelting's wife]?" to which he responded, "Yes." Hauck went on, "Sandra thinks we were talking about Jean" (diminutive for "Virginia," Mrs. Hauck's first name). Plaintiff turned and saw Sandra at the foot of his bed, gun in hand, saying, "Thomas Stoelting, I am going to kill you now." Her father shouted, "Don't shoot!" but the weapon discharged, the bullet penetrating plaintiff's abdominal wall. Sandra ran from the room screaming, "I'm sorry."
Sandra's answers to interrogatories were read into evidence on behalf of the plaintiff. In part, these were to the effect that she took the .45 Colt revolver from the desk in her room, thinking it was unloaded, walked down the hall to the rear bedroom occupied by plaintiff and her father, knocked on *393 the closed door, and entered when someone said, "Come in." She walked to the foot of Stoelting's bed and asked him whether he had been talking about her mother. As he put his hand up toward his head she "pulled the gun up in order to frighten him and it suddenly went off."

I.
Probably the most important trial ruling attacked on the appeal was the refusal of the trial court to allow the defendants to offer proof or to cross-examine the plaintiff on the subject of alleged sexual relations between plaintiff and Sandra commencing about 1955 and continuing until about 11 months prior to the shooting. (Prior to the institution of the action herein, but after the shooting, Stoelting was tried and acquitted of criminal charges of carnal abuse of the girl.) The precise proffer of proof was stated by defendants' counsel at the trial as follows:
"Mr. Mathias: I would like to cross-examine this plaintiff upon incidents which happened within approximately a two year period prior to the day of the shooting. I want to ask him if he carnally abused this girl, if he handled her private parts, if he had intercourse with her of her own volition or by force, whether he applied drugs to her body, whether he supplied her with charms which were drilled out with drugs in them, whether he threatened her over a period of time concerning these relations, whether he threatened to kill her or kill her parents if she told of these relations and whether or not he had since  strike the `since,'  whether he had within a month or so of the day of the shooting repeated his threats to her that, `I will harm or kill your mother if you do not do what I want you to do.'"
The basis for the attempt to offer proof and conduct cross-examination on this subject now advanced is two-fold: first, as bearing upon plaintiff's alleged contributory negligence and assumption of risk; and, second, on the issue of the adult defendants' duty reasonably to foresee and therefore to act to prevent the harm which befell plaintiff. The second ground was never advanced before the trial court *394 and therefore is out of order now. Disposition of the first point requires a close look at the pretrial order.
In the pretrial order plaintiff states his theories of recovery against the infant and adult defendants as based on negligence  in handling the weapon, and in supervision of the girl in respect to weapons, respectively  relying both upon the statutes cited above and general principles of tort liability for negligence. In the pretrial order the infant defendant denies negligence and claims the shooting was accidental "in the sense of an unforeseeable, unpreventable occurrence not due to negligence." This is explained, in substance, by the statement that the girl was in a highly emotional state precluding exercise of due care or formation of any intent in use of the gun, except to frighten the plaintiff, all because of certain unspecified actions of the plaintiff toward her, "both physical and mental," referred to only as "plaintiff's relations with her, which were against her will and beyond her control." It is further asserted that the said actions of plaintiff constituted contributory negligence and assumption of risk in that they were the sole cause of her condition; that "his threats to her concerning herself and her mother" were the "sole proximate cause" of her being in possession of the weapon at the time; and that plaintiff should have known and foreseen that his conduct would drive the girl "temporarily insane."
The adult defendants deny negligence in the pretrial order, allege that Sandra was an independent, intervening agency whose negligence was not foreseeable by them, and assert contributory negligence and assumption of risk and other defenses not presently material.
Consideration of the subject of the alleged prior relations between plaintiff and Sandra was precipitated in advance of trial by a motion by plaintiff to strike so much of the answers to interrogatories as set forth such relations and associated activities of the plaintiff as constituting a basis for the defenses of contributory negligence and assumption of risk. This preliminary ruling was sought in order to avert *395 what plaintiff conceived would be an extremely prejudicial factor if this subject should be aired before the jury in advance of a ruling. The court held that the matter of the prior relationship would be excluded as not bearing "any relation to either" of the defenses of contributory negligence or assumption of risk, but subject to any later development which would warrant a change in that position. The matter came up again when defendants sought leave to cross-examine the plaintiff on this subject. The court heard renewed argument on the point and requested defendants to make the specific proffer as to the scope of the proposed examination quoted above. It then ruled that it was still of the opinion that the allegations in question were "not relevant to the issues framed by the pleadings and by the pretrial order."
Before dealing with the merits of these rulings it must be noted that at the end of the case the trial court eliminated the defenses of contributory negligence and assumption of risk from the case in entirety and did not charge the jury thereon. We reserve consideration of that determination for the next point in this opinion and appraise the ruling with respect to the presently mooted offer of evidence on the assumption that the defenses are technically available in this kind of case.
Reading the comments of the trial court on the occasions of its rulings in reference to evidence of prior relations between the plaintiff and Sandra it is clear to us that the court was not deciding that the evidence was to be excluded because not attempted to be related to the defenses of contributory negligence and assumption of risk in the pretrial order, but rather because the subject matter had no factual relevance to such defenses, or, possibly, only such remote relevance as not to warrant bringing into the case the heavy element of prejudice against the plaintiff which such evidence might entrain. The existence of the latter factor necessarily imported a substantial element of judicial discretion into the disposition of the matter. Relevancy does not always insure the admissibility of proposed proof into *396 evidence. As pointed out by McCormick, the value of the evidence may not be worth what it may cost in terms of arousing the jury's emotions, prejudice or sympathy, creating collateral issues distracting the attention of the jury from the main issues, and in consuming an inordinate amount of time by proof and counter-proof on the side-issue. McCormick on Evidence (1954), § 152, pp. 319-320. The balancing of probative values and probative dangers in this area is peculiarly a matter for the discretion of the trial court. Miller v. Trans Oil Co., 33 N.J. Super. 53, 59, 60 (App. Div. 1954), affirmed 18 N.J. 407 (1955); Dolan v. Newark Iron & Metal Co., 18 N.J. Super. 450, 455 (App. Div. 1952); Iverson v. Prudential Ins. Co., 126 N.J.L. 280, 283 (E. & A. 1941).
It is to be observed that defendants proffered no substantiating proof whatsoever for the sweeping conclusional charge that Sandra was in a highly emotional state during the period leading up to the shooting and that her alleged prior experiences with the plaintiff produced that condition. From the proffer made before the trial court it would appear that defendants expected that the jury would be permitted to infer a condition of emotional insanity in the girl the night of the shooting from nothing more than the facts that these relationships had existed up to a date preceding that event by 11 months and that plaintiff had threatened harm to Mrs. Hauck a month or so before. In our judgment the inference would not have been permissible from no more factual support than that. This applies in respect to both aspects of the contended-for defenses; i.e., causal contribution by plaintiff's own acts to his ultimate injury and his imprudence in remaining at the Hauck home with knowledge of the danger. In this connection it is to be borne in mind that the pretrial order precluded reliance upon any hypothesis of the shooting as an intentional one by any of the parties to this action. All of them deliberately concurred in the theory of the case as being for negligence. Consequently the question now under discussion cannot be weighed *397 from the approach that the shooting might have been in retaliation for or provoked by whatever previous injury plaintiff may have inflicted upon the girl.
We are satisfied that the discretionary ruling by the trial court was, under all the circumstances, well-advised, and, in any event, not shown to have been prejudicial. From none of the other testimony which came into the case is it discernible that this girl showed any unusual emotional reaction to the plaintiff during the period preceding the shooting. The most probable explanation of her motivation in going into his bedroom with the gun was her having overheard what she interpreted as a threat by him to her mother. This does not appear in any way associated with or related to anything which may have transpired between plaintiff and Sandra more than eleven months previously.

II.
In charging the jury the trial judge stated that there was no evidence in the case to support either of the defenses of contributory negligence or assumption of risk and he excluded them from their consideration. Plaintiff defends this ruling on both factual and legal grounds. The hypothesized premise underlying defendants' position is that plaintiff had just as much knowledge of Sandra's dangerous propensities for handling weapons as her parents and that, therefore, his continued frequent visitations of the Hauck home constituted a voluntary and imprudent exposure to the correlative hazards which a jury should have been allowed to pass upon as either contributory negligence or assumption of risk. In the sense just mentioned these defenses coalesce in principle. Hartman v. City of Brigantine, 23 N.J. 530, 536, 537 (1957); Klinsky v. Hanson Van Winkle Munning Co., 38 N.J. Super. 439 (App. Div. 1955), certification denied 20 N.J. 534 (1956); Coffey v. Middlesex-Spotswood, Inc., 52 N.J. Super. 39, 42, 43 (App. Div. 1958), certification denied 28 N.J. 186 (1958).
*398 It is first to be remarked that defendants err in assuming that foreseeability of harm or danger has the same legal scope in relation to a plaintiff's duty of exercising care for his safety as to a defendant's obligation to refrain from conduct involving undue risk of harm to others. It has been convincingly demonstrated that while such a parallelism may appeal to a sense of symmetry in the law it hardly comports with modern judicial tendencies for the constriction of the defenses of contributory negligence and assumption of risk against a tort claimant. 2 Harper and James, Law of Torts (1956), § 22.4, pp. 1209, 1210; § 21.3, pp. 1174, 1175. The case before us is an apt example. As to the adult defendants, as we shall develop later, their liability does not depend on having foreseen the precise manner in which their negligence would eventually lead to actual harm. It is not necessary that the tort-feasor anticipate the very occurrence which resulted so long as it can be said that the injury was the natural and probable consequence of the wrongful act and that it was within the realm of foreseeability that some harm might befall the plaintiff. Bacak v. Hogya, 4 N.J. 417, 424 (1950); Hartman v. City of Brigantine, 42 N.J. Super. 247, 262 (App. Div. 1956), affirmed 23 N.J. 530 (1957). But a plaintiff is, generally speaking, not barred by the concept of fault of his own in the sense of assumption of risk unless he can be said to have voluntarily and knowingly exposed himself to the risk of the specific hazard which eventually hurt him. See 2 Harper and James, op. cit., supra, § 21.2, pp. 1168, 1169. Note the reference to assumption of risks which are "fully comprehended or perfectly obvious" in 2 Harper and James, op. cit., supra, § 21.1, p. 1163; and to "assumption of risk as a matter of knowledge of the danger and intelligent acquiescence in it." Prosser, Law of Torts (1955), § 55, p. 305. And see Hendrikson v. Koppers Co., Inc., 11 N.J. 600, 607 (1953).
In the instant case, were plaintiff to have been injured by an accidental discharge of the firearm while the girl *399 defendant was practicing "quick draws," a different question might be deemed presented in relation to assumption of risk, in the light of plaintiff's knowledge of such conduct (as to which we imply no opinion). But we are in complete agreement with the plaintiff's argument that what he knew as to the girl's handling of weapons and as to the inadequacy of parental supervision with respect thereto could not reasonably be deemed to import a voluntary assumption by him of the risk that she might enter his room with a loaded gun and discharge it in the course of an effort to frighten him.
We thus concur in the trial judge's conclusion that there was no factual basis in the evidence for submission of the defenses of contributory negligence and assumption of risk to the jury.

III.
Plaintiff makes the additional point that the defenses of contributory negligence and assumption of risk are, as a matter of law, not available to one who is sued for the negligent discharge of a firearm. The range of his argument would apply, in any case, only as to the girl defendant. In Petry v. Hopping, 97 N.J.L. 418, 422 (Sup. Ct. 1922), the court assumed, there apparently having been no argument to the contrary, that contributory negligence is a defense against such a cause of action where sustained by the facts.
Some of the cases cited by plaintiff in support of his position appear to depend upon the fact that the firearm was being used in violation of a statute. Evans v. Waite, 83 Wis. 296, 53 N.W. 445 (Sup. Ct. 1892); Horton v. Wylie, 115 Wis. 505, 92 N.W. 245 (Sup. Ct. 1902); cf. Knott v. Wagner, 16 Lea. 481, 84 Tenn. 481, 1 S.W. 155 (Sup. Ct. 1886). Both Oshogay v. Schultz, 257 Wis. 323, 43 N.W.2d 485 (Sup. Ct. 1950), and City of Charleston ex rel. Peck v. Dawson, 97 W. Va. 55, 125 S.E. 234 (Sup. Ct. App. 1924), are negligent shooting cases in which contributory *400 negligence was not found sufficiently grounded in the facts to warrant submission to a jury. They therefore are not helpful as to whether the defense is available as a matter of law.
To the extent that it may be argued that the defenses under discussion are not invocable where the negligent conduct implicates the violation of a penal statute involving the handling or use of firearms, see Annotation, 171 A.L.R. 894 (1947); 10 A.L.R.2d 853 (1950); Restatement of Torts, § 483, we shall forego any exploration of that inquiry for the reason that there is doubt as to the continued viability of N.J.S.A. 2A:151-11 in relation to the incrimination thereunder of minors under 16, in view of the fact that by operation of the later derived N.J.S. 2A:85-4, persons under the age of 16 are deemed incapable of committing a crime. This question was touched upon by the trial judge briefly in dealing with motions at the end of the case. He apparently concluded that liability could not be predicated on the statute involving the handling of firearms by minors as he did not mention it in his charge. The effect of N.J.S. 2A:85-4 on that statute has not been briefed or argued before us, and we will not consider it. For purposes of disposition of the pending appeal our approval of the action of the trial court rests on the absence of sufficient factual support for these defenses to render them issues for resolution by a jury.

IV.
The adult defendants urge that the court erred in submitting the issue as to their liability to the jury. Their emphasis is upon the point that they cannot be held to have anticipated from what they observed as to Sandra's handling of weapons that she would do what the evidence shows she did in reference to plaintiff.
The liability of parents in respect to the duty of controlling minor children so as to prevent them from intentionally or *401 otherwise harming others with firearms was the subject of thorough consideration in Mazzilli v. Selger, 13 N.J. 296 (1953). There such liability was sustained in respect of an 11 year old boy who, as might have been inferred from the evidence, intentionally shot an adult with a shotgun. The governing rule of liability was thus stated (13 N.J. at page 301):
"The duty in the present case is to be found in the principle that one has a duty not to permit a third person to `use a thing or engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others' (emphasis supplied). Restatement of the Law, Torts (Negligence) (1934), sec. 308. This rule in substance was applied in Wilson v. Brauer, 97 N.J.L. 482, 484-485 (E. & A. 1922). Cf. Petry v. Hopping, 97 N.J.L. 418, 421 (Sup. Ct. 1922); Driesse v. Verblaauw, 9 N.J. Misc. 173 (Sup. Ct. 1931). Such a duty has been held to exist in connection with the storage or possession of dynamite cartridges in the home of the parents of an infant. Vallency v. Rigillo, 91 N.J.L. 307, 308 (E. & A. 1917)" (emphasis by court).
The court also approved (13 N.J. at page 302) the expression of the principle in Restatement of Torts (1934), § 316, p. 858, as follows:
"A parent is under a duty to exercise reasonable care so to control his minor child as to prevent it from intentionally harming others or from so conducting itself as to create an unreasonable risk of bodily harm to them, if the parent
(a) knows or has reason to know that he has the ability to control his child, and
(b) knows or should know of the necessity and opportunity for exercising such control."
There is no doubt in our minds that the evidence in the case before us was such as to warrant submission to a jury of the issue of the adult defendants' liability. The facts almost bespeak negligence. A 15 year old girl who, according to the evidence, had had no training or instruction in the handling or use of small arms beyond one visit to a *402 firing range, during which she fired a revolver once, was allowed freedom to handle, wear and play with automatic revolvers, sometimes loaded. She was allowed to sleep in a room where one such loaded gun was kept in an unlocked desk. There is sufficient direct or circumstantial evidence in the case to bring home to both adult defendants culpable knowledge of these conditions and to hold them for default in their duty to control their daughter in this regard. But defendants argue that the duty did not extend to reasonable foresight of a nighttime armed adventure of the kind which transpired here. They treat this factor in two ways, first, as negating a duty, and, second, as refuting the existence of proximate cause, either for lack of foreseeability of the harm done the plaintiff or because of the intervention of an independent, culpable agency.
Preliminarily, we repeat our earlier emphasis upon the fact that this case was pleaded, pretried, tried and defended on the theory of negligence and not intentional infliction of harm upon the plaintiff. The adult defendants never dissented from this theory at the trial. Their motions for dismissal based on the evidence pointing to an intentional shooting were properly denied because the jury could have found a negligent shooting. Nor is any point raised, as to the liability of the adult defendants, with respect to any refusal by the court to charge the jury on the issue of the intentional nature of the shooting. Thus no trial action challenged on this appeal presents the legal question as to whether the liability of the adult defendants would extend to an intentional shooting of the plaintiff by the girl. The most said defendants are at liberty to argue in this regard is that the girl entered the plaintiff's room intending to frighten him with a .45 Colt revolver and that the liability even of negligent parents does not extend to harm resulting from such behavior by a 15 1/2 year old child. There is considerable authority that similarly unexpected activity by children in the 12-15 year age range will visit liability upon a parent or guardian who has failed in his duty of control *403 and supervision in respect to firearms. Sullivan v. Creed, 2 I.R. 317, 2 B.R.C. 139 (Irish H. Ct. of Just. and Ct. of App. 1904); Bebee v. Sales, 32 T.L.R. 413 (K.B. Div. 1916); Kuhns v. Brugger, 390 Pa. 331, 135 A.2d 395 (Sup. Ct. 1957); Kuchlik v. Feuer, 239 App. Div. 338, 267 N.Y. Supp. 256 (App. Div. 1933), affirmed 264 N.Y. 542, 191 N.E. 555 (Ct. App. 1934); Salisbury v. Crudale, 41 R.I. 33, 102 Atl. 731 (Sup. Ct. 1918); Sojka v. Dlugosz, 293 Mass. 419, 200 N.E. 554, 556 (Sup. Jud. Ct. 1936); Marshall v. Wymond, 69 Ind. App. 162, 121 N.E. 449 (Ct. App. 1919). But see Hulsey v. Hightower, 44 Ga. App. 455, 161 S.E. 664, 667-668 (Ct. App. 1931) (intentional stabbing by 15-year-old); Palm v. Ivorson, 117 Ill. App. 535 (App. Ct. 1905) (accidental shooting by a 12-year-old fully trained in hunting and marksmanship). And see Driesse v. Verblaauw, 9 N.J. Misc. 173 (Sup. Ct. 1931).
It is conceded that a parent cannot foresee all the extremities of action to which immaturity of judgment or behavior may lead a 15 year old child and that the adult defendants undoubtedly never foresaw nor could be expected in fact to foresee that Sandra would come upon the plaintiff with a gun as she did here. But without access to a loaded automatic she could never have carried out the impulse which seized her on April 3, 1957, and with adequate training in its use the injurious outcome might not have eventuated. It is to be kept in mind that the law imposes a duty of higher than ordinary care even upon those lawfully using firearms, in view of the danger inherent in their use. Moebus v. Becker, 46 N.J.L. 41, 44 (Sup. Ct. 1884); Petry v. Hopping, supra. It accords with sound policy to impose upon a parent who is negligent in this sensitive area of supervision and control of children a degree of responsibility for injuries directly consequential thereupon extending not only to such as might actually have been foreseen, but to all which may be said to have been the natural and probable results of the parental default, so long as some harm to the plaintiff could have been foreseen; see Bacak *404 v. Hogya, supra. This we think was the case here, thereby encompassing liability on the part of the elder Haucks for the consequences of immature motivation or behavior in combination with negligent handling of the weapon by the child. The facts before us, in the frame of the issues settled by the pretrial order, bring the plaintiff's injury well within the ambit of defendants' potential liability on this approach, with the decision of the issue for resolution by the jury. By the same token, the defense of independent intervening agency is not absolute, but for the consideration of the jury in relation to the requirement of proximate cause. Compare the unforeseeability of the injury-precipitating conduct of the children in Driesse v. Verblaauw, supra.

V.
A number of miscellaneous alleged trial errors are argued by defendants and the verdict is contended to be excessive and indicative of passion, prejudice and mistake on the part of the jury. We have given careful consideration to all of the points argued, find no prejudicial error in any of the trial rulings, and deem the jury verdict well within the evidence and the issues and not so excessive as to warrant disturbance on appeal as against the contrary judgment of the experienced and capable trial judge who sat in this matter.
A word as to the alleged excessiveness of the amount of the verdict. By the time of trial actual outlay for medical expenses was $8,132.45. As much or more had been incurred for convalescent care, and the need for such care would continue for the indefinite future. Plaintiff was undoubtedly permanently disabled to an extent approaching total. The complications attendant upon his injuries and consequential pathological conditions were extensive, and, in some respects, would tend to get worse as time went on. His body had become misshapen. The pain and suffering, past and prospective, were obviously incalculable, but very great. Giving *405 whatever modified weight in the light of the evidence one might conservatively allow for claims for loss of earnings, the appraisal by the jury of the totality of all damages in monetary terms cannot be said to have clearly exceeded the fair range of its permissible judgment.
Affirmed.